UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS:  DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* [SEALED], | |
| Plaintiff, | |
| - against - | |
| [SEALED], | |
| Defendants. | |

Civil Action No.: 3:19-CV-00207-E

FALSE CLAIMS ACT
FIRST AMENDED COMPLAINT

**[FILED UNDER SEAL]**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

JAN 3 1 2020

CLERK, U.S. DISTRICT COURT

By _____
        Deputy

**FILED IN CAMERA AND UNDER SEAL PURSUANT TO
31 U.S.C. § 3730(b)(2)
DO NOT POST ON ECF
DO NOT PUT IN PRESS BOX**

Gillespie Sanford, L.L.P.
4925 Greenville Ave., Suite 200
Dallas, Texas 75206
Tel:    (214) 800-5111
Fax:    (214) 838-0001

POLLOCK COHEN LLP
60 Broad St., 24th Fl.
New York, NY  10004
(212) 337-5361

*Counsel for Plaintiff Relator*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS: DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA and the STATE of TEXAS *ex rel.* JAMES STEVE BURDICK, M.D.,<br><br>*Plaintiff,*<br><br>v.<br><br>BAYLOR UNIVERSITY MEDICAL CENTER, BAYLOR SCOTT & WHITE HEALTH, BAYLOR SCOTT & WHITE HOLDINGS, DIGESTIVE HEALTH ASSOCIATES OF TEXAS, P.A., TEXAS DIGESTIVE DISEASE CONSULTANTS PLLC, HEALTHTEXAS PROVIDER NETWORK,<br><br>*Defendants.* | Civil Action No.: 3:19-CV-00207-E<br><br>FALSE CLAIMS ACT<br>FIRST AMENDED COMPLAINT<br><br>**[FILED UNDER SEAL]** |

     *Qui tam* plaintiff and Relator James Steve Burdick, M.D., through his undersigned attorneys, hereby brings this action on behalf of the United States of America and the State of Texas against:

- Baylor University Medical Center, Baylor Scott & White Health, and Baylor Scott & White Holdings (the "Baylor Defendants"); and

- Digestive Health Associates of Texas, P.A., Texas Digestive Disease Consultants PLLC, HealthTexas Provider Network (the "GI Defendants" and, together with the Baylor Defendants, the "Defendants").

The claims asserted in this Complaint are based on the Defendants: (a) billing for procedures performed with dirty scopes, which cause rampant and entirely avoidable patient harm; and (b) billing for improperly supervised procedures utilizing scopes (whether clean or dirty). In addition, in his individual capacity, Relator asserts claims for unlawful retaliation against the Baylor Defendants and HealthTexas Provider Network ("HealthTexas"). The claims are based on the facts and information set forth below and upon information and belief, unless otherwise stated.

## Table of Contents

**NATURE OF THE ACTION** ............................................................................. 4

**PARTIES** ........................................................................................................ 6

    A. Relator – Dr. Burdick ............................................................... 6

    B. Baylor Scott and White.............................................................. 10

    C. Defendant Baylor Scott & White Health ................................... 11

    D. Defendant Baylor Scott & White Holdings................................ 11

    E. Defendant Baylor University Medical Center ........................... 12

    F. Defendant HealthTexas Provider Network................................. 12

    G. Defendant Digestive Health Associates of Texas........................ 13

    H. Defendant Texas Digestive Disease Consultants ....................... 14

**JURISDICTION AND VENUE** ...................................................................... 14

**FACTS** .......................................................................................................... 15

  I. Governing Laws................................................................................ 15

    A. The Federal False Claims Act.................................................... 15

    B. The Texas False Claims Act ...................................................... 16

    C. The Federal Health Benefit Programs........................................ 18

  II. Defendants made fraudulent claims for procedures performed with dirty scopes and inadequate equipment ....................................................................................... 20

    A. Medicare Conditions of Participation.......................................... 20

    B. False Endoscopy Claims – Dirty Scopes..................................... 22

    C. False Endoscopy Claims – Inadequate Equipment Maintenance............................... 36

  III. Defendants made fraudulent claims for procedures performed with inadequate supervision......................................................................................................... 38

    A. Medicare's Requirements for Medical Supervision...................................... 38

    B. False Endoscopy Claims – Inadequate Supervision .................................... 39

  IV. Defendants made fraudulent claims for medically worthless procedures. ........................ 41

  V. The Baylor Defendants and HealthTexas retaliated against Relator............................... 42

A. Unreasonable and Unsafe Working Conditions ........................................................... 45

B. Financial Retaliation ..................................................................................................... 52

C. Sham Suspensions ......................................................................................................... 55

D. Scuttled job opportunity ............................................................................................... 61

VI. The Hospital had a pattern and practice of putting retaliation and competition ahead of patient care ........................................................................................................................ 64

**CAUSES OF ACTION .................................................................................. 68**

## NATURE OF THE ACTION

1.      Relator sues Defendants to recover treble damages and civil penalties on behalf of the United States of America and the State of Texas for Defendants' several schemes to maximize income from their gastroenterology practice by submitting false claims for payment to Medicare, Medicaid, TRICARE, and other federally or state-funded government healthcare programs (hereinafter referred to as "Government Healthcare Programs").

2.      Relator also sues the Baylor Defendants and HealthTexas for their retaliation against him after he internally reported these various schemes and otherwise tried to stop the fraud and patient safety violations complained about herein.

3.      Defendants knew they did not meet the established criteria set by the various Government Healthcare Programs and other applicable laws and regulations.

4.      Defendants engaged in these widespread frauds against the United States and Texas in violation of the False Claims Act, 31 U.S.C. § 3729 *et seq.* ("FCA") and the Texas False Claims Act, Tex. Hum. Res. Code §§ 36.001-132 ("TFCA").

5.      As a former employee of HealthTexas and currently a practicing physician with privileges at Baylor University Medical Center ("BUMC"), Relator personally observed, and continues to observe, Defendants engage in practices that make it impossible for Defendants to satisfy the Government Healthcare Programs' requirements for billing interventional gastroenterology procedures.

6.      Interventional gastroenterology involves the insertion of a duodenoscope, endoscope, or bronchoscope (collectively "scopes," and each individually, a "scope") into the bodies of patients to perform a variety of minimally invasive procedures.

7.      Most people are at least passingly familiar with the most common diagnostic procedures that utilize these scopes: colon cancer and throat cancer screenings.

8. Because the scopes are inserted into various orifices and body cavities of sometimes very sick patients, adherence to proper cleaning and disinfecting protocols is extremely important.

9. The Center for Disease Control and Prevention (CDC), the Joint Commission,[1] the Food and Drug Administration (FDA), and the Centers for Medicare and Medicaid services (CMS) have all highlighted the importance of proper scope cleaning.

10. One of Medicare's "Conditions of Participation" is establishing and enforcing a functioning system of infection control.

11. Proper cleaning – also called reprocessing – of scopes is required for compliance with Medicare's Conditions of Participation and those same conditions have been applied to participation in Medicaid per 42 C.F.R. § 482.1(a)(5).

12. Relator observed, and continues to observe, the Baylor Defendants and GI Defendants fail to properly or adequately reprocess and otherwise maintain scopes, resulting in avoidable but deadly post-scope infections and other complications.

13. Despite knowing of these failures, Defendants continue to submit claims to Government Healthcare Programs for these procedures.

14. Government Healthcare Program rules also require that doctors training to be gastroenterologists be properly supervised when learning and performing interventional procedures.

15. Relator observed, and continues to observe, the Baylor Defendants and GI Defendants fail and refuse to adequately supervise gastroenterologists in training. Instead, the

---

[1] A national accreditation and certification entity.

Baylor Defendants and GI Defendants permit or require these training doctors to perform procedures without proper supervision.

16.     Deadly complications have resulted; complications that would have been avoidable had the Defendants followed established, required protocols.

17.     Despite knowing of these failures, the Baylor Defendants and GI Defendants continue to submit claims to Government Healthcare Programs for these procedures.

18.     Relator repeatedly informed HealthTexas and the Baylor Defendants of some or all of these many frauds.

19.     Defendants, however, repeatedly failed to adequately address these problems and the frauds continue to this day.

20.     After he raised the alarm on these dangerous and fraudulent practices, the Baylor Defendants and HealthTexas undertook an escalating campaign of retaliation against Dr. Burdick which culminated in unjustified administrative suspensions of his hospital privileges, material changes to his working environment, the scuttling of a lucrative job offer with another hospital system, and other financial penalties including unwarranted restrictions on his participation in Baylor controlled insurance.

## **Parties**

### A.     **Relator – Dr. Burdick**

21.     Relator James Steve Burdick, M.D. resides in Dallas County, Texas. Dr. Burdick was employed by HealthTexas as a gastroenterologist from July 1, 2006 to July 31, 2017. From 2006 to the present he has had medical staff privileges at BUMC. Dr. Burdick continues to see and treat patients at BUMC.

-6-

22.      Since August 2017, Dr. Burdick has been working for and billing through Advanced Endoscopy Consultants, LLP, a physician services entity he created that same year.

23.      Dr. Burdick is an award winning and internationally renowned gastroenterologist and endoscopist.

24.      After graduating from Oklahoma School of Medicine and completing an internal medicine residency at the Medical College of Wisconsin where he was the Chief Resident, Dr. Burdick completed gastroenterology and therapeutic endoscopy fellowship training at the Medical College of Wisconsin, Milwaukee and Racine campuses.

25.      Dr. Burdick has been licensed to practice medicine in Wisconsin, Illinois, and Texas.

26.      He is board certified in Gastroenterology and held many academic appointments over his long career.

27.      Since 2007, he has been included in the annual "Best Doctors in America" list and, in 2017, Dr. Burdick was awarded the American Gastroenterology Association Distinguished Clinician Award.

28.      He received the Physician of the Year award while on staff at the University of Texas Southwestern Medical Center where he also served as the Director of Endoscopy, Director of Fellowship Training, Director of Gastroenterology at Parkland Hospital and Quality Assurance Director for Gastroenterology.

29.      Dr. Burdick has published numerous peer-reviewed articles and abstracts, authored several book chapters, and given many national presentations.

30.      Dr. Burdick has materially advanced the field.

31. He has invented, perfected, or improved multiple procedures, techniques, and tools. Dr. Burdick was the first in the United States or the world to perform some of these procedures.

32. One of the endoscopic techniques Dr. Burdick invented has been named "Burdick's Technique."

33. Dr. Burdick was the first in the United States to:

    (a)    perform a Zenker's myotomy;

    (b)    perform ablation of cholangiocarcinoma with an investigational device; and

    (c)    use endosponge therapy for upper GI tract disease.

34. Dr. Burdick was the youngest director of fellowship for gastroenterology in the United States.

35. Dr. Burdick served as an expert for the prosecution in connection with the death of Michael Jackson.

36. Dr. Burdick has also had a long history of caring for patients without regard for their ability to pay for his services.

37. Mother Teresa and the Sisters of Charity recognized his charity work by awarding him the Sisters of Charity Recognition Award in December 1995.

38. In fact, Dr. Burdick later chose to go work for the Baylor Defendants and HealthTexas because he believed he would have more opportunities to treat the indigent population at Baylor than through the other employment opportunities he had at the time.

39. From July 1, 2006 to July 31, 2017, Dr. Burdick was an employee of HealthTexas.

40. In 2006, Dr. Burdick obtained privileges and membership on the Medical Staff at BUMC.

41.     He continues to hold privileges, be a member of the Medical Staff, and see and treat patients at BUMC.

42.     Currently, Dr. Burdick is the Program Coordinator of the San Antonio Military Medical Center Gastroenterology Program.

43.     Dr. Burdick's specialty is performing interventional or therapeutic endoscopy.

44.     In other words, he inserts special endoscopes (or, more simply, "scopes") into the bodies of patients to perform a variety of minimally invasive procedures.

45.     While Dr. Burdick does perform some routine esophageal and colorectal diagnostic procedures, what sets him apart from his peers is his ability to use scopes to perform natural orifice transluminal endoscopic surgery, therapeutic endoscopy, Endoscopic Ultrasound ("EUS"), and Endoscopic Retrograde Cholangiopancreatography ("ERCP"). These specialized procedures are used to treat a variety of more complicated and difficult-to-manage conditions like life-threatening gallbladder and pancreas infections and stones.

46.     In addition, various bleeding conditions along and within the gastrointestinal ("GI") tract can be treated by these procedures. These procedures are not only performed by Dr. Burdick, but in some cases, he was the doctor responsible for pioneering and perfecting them.

47.     For example, in patients with certain liver diseases, it is possible for small blood vessels in the stomach and esophagus to swell and rupture, creating a life-threatening bleed. Without emergent treatment, these patients will bleed to death. Dr. Burdick is uniquely qualified to perform some of those life-saving treatments.

48.     Not all GI doctors or even endoscopy-trained GI doctors are able to perform the same breadth and extent of procedures as Dr. Burdick.

- 9 -

49. For this reason, Dr. Burdick has received referrals from nearly 600 unique physicians over the last two years alone.

50. He is also routinely called upon to assist other services within BUMC to treat their most critical and hardest-to-manage patients, and is often called on to do so on an emergency basis.

51. For example, the liver transplant team at BUMC routinely calls on Dr. Burdick to perform therapeutic endoscopy to fix various complications like biliary leaks and bypass obstructions.

52. This Complaint is not based on a public disclosure as defined in 31 U.S.C. § 3730(e). Relator sues as the original source of information regarding Defendants' violations of the FCA, given that Relator has direct and independent knowledge of the information on which the allegations are based and/or knowledge that is independent of and materially adds to any allegations or transactions which may have been publicly disclosed (although Relator knows of no such public disclosure).

53. By letter dated August 9, 2018, Relator provided notice to the United States Attorney General, the United States Attorney for the Northern District of Texas, and the Attorney General of the State of Texas regarding the fraud at issue here.

**B. Baylor Scott and White**

54. Baylor Scott and White is a healthcare conglomerate that ultimately owns and controls both Baylor University Medical Center and HealthTexas.

55. Baylor Scott and White operates this ownership and control through a host of entities which, upon information and belief, include the various Baylor Scott and White entities named as defendants herein.

- 10 -

56.     Baylor Scott and White is truly enormous and advertises having "more than 800 patient access points."

57.     As of 2017, Baylor Scott and White Health had $11.1 billion in total assets, $9.1 billion in total operating revenue, 30 retail pharmacies, 48 owned, operated, joint-venture and affiliated hospitals (including BUMC), and numerous outpatient, primary care, specialty care, surgical and other clinics and similar facilities.

58.     Additional advertised facts and numbers with respect to Baylor Scott and White Health can be found here: https://www.bswhealth.com/about/pages/default.aspx.

**C.     Defendant Baylor Scott & White Health**

59.     Defendant Baylor Scott & White Health is a non-profit corporation organized under the laws of the State of Texas with a principal place of business at 2001 Bryan St., Suite 2200, Dallas, Texas and is the successor entity for Baylor Scott & White Health Service LLC.

60.     Upon information and belief, Baylor Scott & White Health owns and/or controls Baylor University Medical Center and HealthTexas; or it owns and/or controls another Baylor Scott and White entity that owns and/or controls Baylor University Medical Center and HealthTexas.

**D.     Defendant Baylor Scott & White Holdings**

61.     Defendant Baylor Scott & White Holdings is a non-profit corporation organized under the laws of the State of Texas with a principal place of business at 350 N. Saint Paul St., Suite 2900, Dallas, Texas and the successor entity for Baylor Scott & White Health LLC.

62.    Upon information and belief, Baylor Scott & White Holdings owns and/or controls BUMC and HealthTexas; or it owns and/or controls another Baylor Scott and White entity that owns and/or controls Baylor University Medical Center and HealthTexas.[2]

**E.    Defendant Baylor University Medical Center**

63.    Defendant Baylor University Medical Center ("BUMC") is a non-profit corporation organized under the laws of the State of Texas with a principal place of business at 2001 Bryan St., Suite 2300, Dallas, Texas.

64.    BUMC is owned by Baylor Scott and White Health, a national healthcare conglomerate.

65.    BUMC is a large Dallas-area medical center with 914 licensed beds, over 1,200 physicians, and nearly 5,000 employees.

**F.    Defendant HealthTexas Provider Network**

66.    Defendant HealthTexas Provider Network ("HealthTexas") is a non-profit corporation organized under the laws of the State of Texas with a principal place of business at 2001 Bryan St., Suite 2800, Dallas, Texas.

67.    HealthTexas is a nominally non-profit entity created and controlled by Baylor Scott and White Health to hire and control physician employees and thereby staff the Hospital with physicians.

68.    Dr. Burdick had an employment contract with HealthTexas, titled a Physician Employment Agreement ("PEA"), with an effective date of July 1, 2006.

---

[2] The terms the "Hospital" and "Baylor" are used interchangeably throughout this Complaint to refer to one or more of Baylor University Medical Center, Baylor Scott and White, Baylor Scott & White Health, and Baylor Scott & White Holdings.

69.     During the years that Dr. Burdick was employed by HealthTexas, HealthTexas was led by Sarah Gahm who held the title Chief Administrative Officer, and Dr. F. David Winter, who held the titles Chief Clinical Officer and Chairman of the Board.

70.     From 2006 until 2015, Dr. Burdick was the only gastroenterologist continuously employed by HealthTexas and working at Baylor University Medical Center.

71.     HealthTexas offers an opaque and complicated compensation scheme to its physician employees that is not competitive with the local or national market.

72.     HealthTexas uses its outsized control over variable physician compensation as part of its attempt to control its physician employees including Dr. Burdick.

73.     Each procedure a doctor performs in a hospital setting generates two sets of charges and bills: hospital-side charges and bills, and physician-side charges and bills.

74.     Under the PEA, Dr. Burdick was entitled to retain his physician-side collections after satisfying HealthTexas's overhead charges.[3]

75.     As a general matter, hospital-side charges tend to be approximately 10 times larger than physician-side bills. The Hospital retains all collections resulting from hospital-side bills.

### G.     Defendant Digestive Health Associates of Texas

76.     Defendant Digestive Health Associates of Texas, P.A. ("DHAT") is a professional association organized under the laws of the State of Texas with a principal place of business at 7610 N. Stemmons Fwy., Suite 600, Dallas, Texas.

---

[3] During the initial term of the PEA (the first year of Dr. Burdick's employment), a base salary was also part of the compensation calculation. That initial period ended in 2007 before the events at issue here.

77.     DHAT is a separate and independent entity that employs gastroenterologists in the Dallas region and then contracts with various hospitals, including the Hospital, to provide physician services.

**H.     Defendant Texas Digestive Disease Consultants**

78.     Defendant Texas Digestive Disease Consultants PLLC ("TDDC") is a professional limited liability company organized under the laws of the State of Texas with a principal place of business at 8267 Elmbrook Dr., Suite 200, Dallas, Texas.

79.     TDDC is a separate and independent entity that employs gastroenterologists in the Dallas region and then contracts with various hospitals, including the Hospital, to provide physician services.

## JURISDICTION AND VENUE

80.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1345 because this action involves a federal question and the United States is a plaintiff. This Court also has subject matter jurisdiction under 31 U.S.C. § 3732(a).

81.     The Court has supplemental subject matter jurisdiction over the state law claims under 28 U.S.C. § 1367 because they are so related to the False Claims Act that they form part of the same controversy and under 31 U.S.C. § 3732(b) because the state law causes of action arise from the same transactions or occurrences as the claims brought under 31 U.S.C. § 3730.

82.     The Court may exercise personal jurisdiction over the Defendants under 31 U.S.C. § 3732(a). The Court has personal jurisdiction over Defendants because they regularly transact business within this District.

83. Venue is proper in this District under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) & (c) because Defendants transact business or are found within this District and a substantial part of the events establishing the alleged claims arose in this District.

84. No allegation in this Complaint is based on a public disclosure of allegations or transactions in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or from the news media. Rather, Relator is the original source of the discovery of the wrongdoing alleged.

85. Under 31 U.S.C. § 3730(b)(2), this Complaint was filed *in camera* and under seal and shall not be served on the Defendants until the Court so orders.

86. Pursuant to 31 U.S.C. § 3730(b)(2), contemporaneous with filing the Complaint, Relator provided the Government with a copy of the Complaint and Relator's written disclosure statement, together with exhibits, of substantially all material evidence and material information in his possession referenced in and/or related to the Complaint.

## FACTS

I. **Governing Laws**

    A. **The Federal False Claims Act**

87. Originally enacted in 1863, the FCA was substantially amended in 1986 by the False Claims Amendments Act. The 1986 amendments enhanced the Government's ability to recover losses sustained because of fraud against the United States.

88. The FCA imposes liability upon any person who "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval," "knowingly makes, uses, or causes to be made or used, a false record or statement material to a

false or fraudulent claim," or conspires to do so. 31 U.S.C. § 3729(a)(1). Any person found to have violated these provisions is liable for a civil penalty of up not less than $11,181 and not more than $22,363 for each such violation, plus three times the damages sustained by the Government.

89.     The FCA imposes liability where the conduct is "in reckless disregard of the truth or falsity of the information" and clarifies that "no proof of specific intent to defraud" is required. 31 U.S.C. § 3729(b).

90.     The FCA also broadly defines a "claim" to include "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that - …is made to a contractor, grantee, or other recipient if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest…" 31 U.S.C. § 3729(b)(2)(A).

91.     The FCA empowers private persons having information regarding a false or fraudulent claim against the Government to sue on behalf of the Government and to share in any recovery.  The complaint must be filed under seal without service on any defendant.  The complaint remains under seal while the Government conducts an investigation of the allegations and determines whether to intervene. 31 U.S.C. § 3730(b).

**B.      The Texas False Claims Act**

92.     The Texas False Claims Act ("TFCA"), which appears at Tex. Hum. Res. Code §§ 36.001-132, is similar to the FCA but is limited in application to claims made to the Texas Medicaid program.

93.     Like the FCA, the TFCA prohibits the submission of false claims and permits private persons to bring an enforcement action on behalf of the State.

94.     Specifically, V.T.C.A. Hum. Res. Code § 36.002 provides liability for any person

who

> (1) knowingly makes or causes to be made a false statement
> or misrepresentation of a material fact to permit a person to
> receive a benefit or payment under the Medicaid program
> that is not authorized or that is greater than the benefit or
> payment that is authorized;
>
> (2) knowingly conceals or fails to disclose information that
> permits a person to receive a benefit or payment under the
> Medicaid program that is not authorized or that is greater
> than the benefit or payment that is authorized;
>
> ***
>
> (4) knowingly makes, causes to be made, induces, or seeks to
> induce the making of a false statement or misrepresentation
> of material fact concerning:
>
>> (A) the conditions or operation of a facility in order that the
>> facility may qualify for certification or recertification
>> required by the Medicaid program, including certification
>> or recertification as:
>>
>>> (i) a hospital … or
>>
>> (B) information required to be provided by a federal or state
>> law, rule, regulation, or provider agreement pertaining to
>> the Medicaid program;
>
> ***
>
> (6) knowingly presents or causes to be presented a claim for
> payment under the Medicaid program for a product
> provided or a service rendered by a person who:
>
>> (A) is not licensed to provide the product or render the
>> service, if a license is required; or
>>
>> (B) is not licensed in the manner claimed;
>
> (7) knowingly makes or causes to be made a claim under the
> Medicaid program for:
>
> ***

- 17 -

(B) a service or product that is substantially inadequate or inappropriate when compared to generally recognized standards within the particular discipline or within the health care industry; or

(C) a product that has been adulterated, debased, mislabeled, or that is otherwise inappropriate;

(8) makes a claim under the Medicaid program and knowingly fails to indicate the type of license and the identification number of the licensed health care provider who actually provided the service;

(9) conspires to commit a violation of Subdivision (1), (2), (3), (4), (5), (6), (7), (8), (10), (11), (12), or (13);

\*\*\*

(12) knowingly makes, uses, or causes the making or use of a false record or statement material to an obligation to pay or transmit money or property to this state under the Medicaid program, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to this state under the Medicaid program; or

(13) knowingly engages in conduct that constitutes a violation under Section 32.039(b) [which includes as a violation: "presents or causes to be presented to the commission a claim that contains a statement or representation the person knows or should know to be false"].

95.     Each of the false claims and other FCA violations alleged herein which were presented to Medicaid are also violations of the TFCA.

### C.     The Federal Health Benefit Programs

96.     Medicare was created in 1965 by Title XVIII of the Social Security Act and is by far the largest health plan in the United States.  Medicare Part A (the basic plan of hospital insurance) covers the cost of hospital inpatient stays and post-hospital skilled nursing facility care. 42 U.S.C. § 1395j to 1395w-4.  Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage (typically 80%) of the fee schedule amount of physician and laboratory services.  42 U.S.C. §§ 1395k, 13951, 1395x(s).

- 18 -

97.     Medicare is generally administered by the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services. CMS establishes rules for, and contracts with private companies to handle, the day-to-day administration of Medicare.

98.     Medicare only pays for services or equipment that are reasonable and medically necessary. 42 U.S.C. § 1395y(a)(l)(A). Further, all providers enrolled in the Medicare program must provide economical medical services. 42 U.S.C. § 1320c-5(a)(l). Providers must assure that the services they provide are medically necessary and appropriate. *See* 42 U.S.C. §1320c-5(a)(3). The funds used to pay Medicare Part A claims come both from federal payroll and general tax revenues. The funds to pay for Part B come from premiums paid by Social Security recipients and general U.S. tax revenues.

99.     Medicaid is a joint federal-state program that provides healthcare benefits for certain groups: primarily the poor and disabled. States administer their own Medicaid programs under federal regulations that govern what services should be provided, and under what conditions. CMS monitors the state-run programs and establishes requirements for service delivery, quality, funding, and eligibility standards. The federal government provides a portion of each state's Medicaid funding, known as the Federal Medical Assistance Percentage ("FMAP"). The FMAP is based on the state's per capita income compared to the national average. 42 U.S.C. § 1396d(b). State Medicaid programs must cover inpatient hospital services.

100.    As required by federal law, the State of Texas has developed a Medicaid plan and received approval for the plan from the United States Department of Health and Human Services.

101.    Together, the Texas Medicaid and Children's Health insurance Program provides medical coverage for more than 4 million Texans.

102.  The Department of Defense administers the TRICARE health care program for active duty and retired members of the uniformed services, their families, and survivors.  10 U.S.C. §§ 1071-1110b.

## II.  Defendants made fraudulent claims for procedures performed with dirty scopes and inadequate equipment

### A.  Medicare Conditions of Participation

103.  42 U.S.C. § 1395x(e) provides that the Secretary of Health and Human Services may impose conditions on hospitals participating in Medicare.  Those same conditions have been applied to participation in Medicaid per 42 C.F.R. § 482.1(a)(5).

104.  Among the Conditions of Participation that have been imposed is the requirement that hospitals create and maintain an effective system of infection control.

> Condition of participation: Infection control.  The hospital must provide a sanitary environment to avoid sources and transmission of infections and communicable diseases. There must be an active program for the prevention, control, and investigation of infections and communicable diseases.

105.  CMS, the Centers for Disease Control, the Joint Commission, the FDA, device manufacturers, the medical literature, and even recent judicial decisions uniformly require hospitals to properly clean and disinfect scopes between uses.

106.  Hospitals are required to follow device manufacturers' recommendations and instructions.

107.  Failure to properly clean scopes and/or follow manufacturer recommendations is citable by CMS inspectors as a failure to abide by the infection control Condition of Participation.

108.  The CDC and FDA have released multiple urgent health updates about proper scope cleaning.

109.    BUMC's own policies and procedures require staff to follow the Society of

Gastroenterology Nurses and Associates, Inc's ("SGNA") cleaning and disinfection standards.

110.    SGNA mandates that providers be familiar with and follow device manufacturers'

most recent cleaning protocols.

111.    According to SGNA, and at a minimum, proper cleaning requires the following

steps:

        (a)     precleaning;

        (b)     leak testing;

        (c)     manual cleaning;

        (d)     rinse after cleaning;

        (e)     visual inspection;

        (f)     high-level disinfection (manual or automated);

        (g)     rinse after high level disinfection;

        (h)     drying (alcohol and forced air); and

        (i)     storage.

112.    Under 21 C.F.R. §§ 803.30-803.33, hospitals are also required to report certain

scope related infections to the FDA.

113.    As a matter of pattern and practice, Defendants fail to meet the above scope

cleaning requirements and guidelines.

114.    Defendants even disregard their own written policies and procedures in favor of

saving time and money.

115.    Indeed, even after numerous patients suffered avoidable infection, maiming, and

death, and even after Relator and others repeatedly reported the unsafe conditions, Defendants

refused to comply with their duties.

- 21 -

### B. False Endoscopy Claims – Dirty Scopes

116. Since at least 2013, the Baylor Defendants and the GI Defendants have engaged in a systemic effort to submit false and fraudulent claims for endoscopic procedures to Government Healthcare Programs. The Defendants engaged in this fraudulent scheme in part by knowingly failing to meet the minimum conditions of participation for those programs.

117. As noted above, one of the main tools of Dr. Burdick's trade are scopes which are inserted into patients (normally through an existing orifice) to visualize various internal structures and perform therapeutic procedures.

118. The scopes are expensive – but reusable – pieces of medical equipment.

119. Because the scopes are inserted into various orifices and body cavities of sometimes very sick patients, adherence to proper cleaning and disinfecting protocols is extremely important.

120. The CDC, Joint Commission, FDA, and CMS have all highlighted the importance of proper scope cleaning.

121. Proper cleaning – also called reprocessing – of scopes is required for compliance with Medicare's Infection Control Condition of Participation.

122. Each manufacturer publishes cleaning guidelines for each of their scopes.

123. Like the other manufacturers in its field, Olympus, which makes the scopes used at BUMC, publishes cleaning guidelines.

124. The Hospital's own internal policy requires adherence to the cleaning standards set out by the Society of Gastroenterology Nurses and Associates, Inc.

125. The medical literature includes papers addressing the need to properly clean scopes, how to properly clean scopes, common pitfalls, and the dangers presented by improperly cleaned scopes.

126.    In general, all scope cleaning processes require immediate, vigorous, and thorough manual cleaning followed by processing with specific liquid disinfectants.

127.    Defendants' "quick and dirty" cleaning protocol may have saved Defendants' money, but it violated all relevant guidelines, requirements, and best practices, while causing real and serious harm to patients including more than one avoidable death and scores of avoidable infections.

1.    *Dirty scopes cause patient harm.*

128.    Immediately manual cleaning of scopes is important because detritus left to dry and crust onto and into scopes makes the subsequent liquid cleaning process much less effective.

129.    Indeed, entire internal portions of the scopes, called channels, can become occluded with hardened fecal matter and other debris making liquid cleaning alone uniquely inadequate.

130.    In lay terms, when a doctor removes a scope from a patient's mouth or anus, the scope must be well cleaned before being inserted into a new patient.

131.    If not, prior patient feces, blood, and other fluids can be inserted into the next patient.

132.    The picture below shows a clean scope.



133.    The picture below shows a contaminated scope presented for Dr. Burdick's use on a patient.  The visible detritus is prior patient blood and associated bacteria and other medical waste materials.



134. The pictures below show a dirty scope presented for Dr. Burdick's use at BUMC in January 2020 and slime left on a glove used to handle the scope. (Of course, Dr. Burdick did *not* use the obviously contaminated tools on any patients.)





135.    Failure to completely clean and disinfect a scope often results in the creation of a reservoir of multi-drug resistant organisms.

136.    These "superbugs" are the cause of multi-drug resistant infection. Methicillin-resistant Staphylococcus aureus, commonly known as "MRSA," is the superbug with which the public and mass media may be most familiar.

137.    Other superbugs, such as E. coli and Pseudomonas, can also be found on incompletely or incorrectly cleaned scopes.

138.    In addition to creating fertile grounds for the creation and accumulation of multi-drug resistant organisms, inadequate scope cleaning can result in the creation of bacterial biofilms.

139.    Biofilms are robust and difficult to eradicate structures created by certain types of bacteria.

140.    Biofilms are notoriously difficult to penetrate with antibacterial drugs, even inside the body.

141.    Another step of the standard cleaning process requires that the interior portions of scopes be completely dried using forced air.

142.    Failure to completely dry the insides of scopes creates a risk for the development of biofilms.

143.    Again, performing proper early scrubbing and following the correct disinfection protocols are the keys to preventing these dirty and dangerous conditions.

144.    It should come as no surprise that inserting dirty medical devices into patients can cause – and often does cause – virulent infections.

145.    These infections are commonly known as scope infections, post-scope infections, or post-procedure infections.

146.    Post-scope infections are known in the medical literature but are vanishingly rare at institutions that set up and follow robust infection controls.

2.    *Baylor has a scope infection problem.*

147.    Between 2006 and 2013, Baylor had zero scope infections.

148.    Starting in 2013, and continuing to the present, Baylor has had more than 30 scope infections and several deaths.

149.    Coincident with the appearance of scope infections in 2013, Dr. Burdick noticed a dramatic increase in the number of dirty scopes being presented for his use.

150.    When the dirty condition was apparent to Dr. Burdick, he would refuse to use the scope.

151.    On some occasions however, the filth was not apparent to the physician using the scope at all or until after it was inside a patient.

152.    Sometimes, after a scope was already inside a patient, a channel would be observed to be occluded.  In other cases, black particulate matter would be expelled into the patient.

153.    On at least six occasions, foreign bodies (a combination of partially used devices, tissue, blood, and fluids from prior patients) were discovered inside a scope while the scope was inside a new patient.

154.    As soon as the dirty scopes and scope-infections appeared, Dr. Burdick reported the events and the likely causes to his superiors at HealthTexas and the Hospital.

155.    Dr. Burdick also suggested remedies.

156.    This is not a novel or difficult problem to address: dirty scopes cause infections.

3. *The Hospital does not have a proper scope cleaning process.*

157.    The Hospital's cleaning failures are manifold.

158.    The scope cleaning process must begin within one hour of a scope being withdrawn from a patient's body, but Baylor regularly fails to meet this standard.

159.    Baylor leadership instructs technicians to let scopes hang and dry instead of immediately beginning the cleaning process, as recommended by the manufacturer and by SGNA protocols. That is because Baylor prefers not to provide the additional staffing or funding required for this work to be done in a timely manner.

160.    Baylor uses a paper tracking system called "Scope Passports" to record the time of day at which a scope is used and precleaned, and when it goes through each part of the cleaning process.

161.    These Scope Passports show long multi-hour lags between pre-cleaning and the first step of the cleaning process.

162.    This delay is counter to the recommended protocol.

163.    If the scopes cannot be cleaned immediately, they must be soaked in a disinfectant soap for a prolonged period of time. The Defendants fail to properly or consistently employ this safety protocol as well.

164.    In fact, until January 2019, BUMC had not bothered to obtain the piece of equipment needed to do these long soaks.

165.    After finally obtaining the required piece of equipment, Baylor proceeded to misuse the device and started systematically and dramatically over-soaking endoscopes.

166.    Oversoaking endoscopes can cause them to break and become unsafe to use and also presents new and additional opportunities for contamination.

167. Since then, Baylor has reverted to very short and inadequate soak times of fewer than five minutes.

168. The cleaning process implemented by Baylor is deficient in other ways as well.

169. For example, the Olympus brand scopes must have their channels blown clear and dried. At the Hospital, this is not done. Until 2019, Baylor had not even bothered to obtain the equipment needed for this task.

170. For at least a period of time in 2019, after finally acquiring some of the correct machinery, Baylor used the wrong cleaning liquids.

171. Even to this day, scopes are left to hang dry and dirty, and are then given only a cursory washing when they should be immediately manually cleaned and processed through a liquid cleaning machine.

172. Baylor continues to improperly and incompletely clean its scopes and patients continue to contract life and limb threatening antibiotic resistant infections.

173. Baylor, and Baylor leadership, are well aware of proper cleaning processes and procedures, but have made the choice that the money and time needed to perform safe reprocessing is not worth it.

174. For example, the current Chief of the GI Section, Dr. Spechler, previously ran the local VA's GI department. While Dr. Spechler was at the VA, the VA followed proper scope cleaning protocols, but while at Baylor, Dr. Spechler has tolerated woefully deficient cleaning protocols.

4. *Baylor fails to investigate, track, or correct infections.*

175. Baylor has also refused to properly track and resolve existing scope infections.

176. For example, Dr. Burdick has requested that scopes used on individual patients who got infected be sequestered, cultured, and thoroughly cleaned.

- 29 -

177.    Key staff members and agents of the Defendants – including, but not limited to, Dr. Bradley Lembcke (the then Chief Medical Officer for BUMC), Dr. Warren Lichliter (the then Chief of Colorectal surgery), and Martha Buhman (the then Director of the Medical Staff Office) refused to implement Dr. Burdick's request that patients exposed to dirty scopes be informed and tested for various life-threatening communicable diseases. These diseases, which included HIV/AIDS and hepatitis, put at risk not only the immediately-impacted patients, but others in the community.

178.    Dr. Burdick made these reports and recommendations through the Hospital's internal complications reporting protocol – both on paper and via email.

179.    Some of these reports were submitted on Dr. Burdick's behalf by his administrative assistant.

180.    Dr. Burdick also raised these concerns verbally at journal club and GI Section meetings.

181.    Each time, Dr. Burdick was told by Defendants that there was no problem.

182.    Dr. Burdick specifically discussed these issues with the Chief of the GI Section, Dr. C. Richard Boland, the Chiefs of the GI Lab, Drs. Dan DeMarco and Larry Schiller, and Dr. Spechler, who would later become Chief of the GI Section.

183.    Each acknowledged the reports and complaints yet refused to take appropriate, or any, corrective action.

184.    Instead, these physician leaders claimed they could not, or more accurately would not, find any deficiencies in the status quo that was harming and killing patients.

185.    Baylor does, however, track certain related metrics as required by Graduate Medical Education (also known as GME).

186. Even according to Baylor's own internal numbers, BUMC is failing multiple categories of hospital acquired infections, and GI Lab sterilization compliance.

5. *Baylor's dirty scope problem continues to this day.*

187. Dirty scopes continue to be presented for physician use at the Hospital. And patients continue to get infected with entirely preventable yet terrible and dangerous infections.

188. Dr. Burdick and others continue to find foreign material inside the scopes they are presented for use on patients. Sometimes these contaminates cannot be found until after the scope has been used on a patient and the patient has been exposed.

189. The scope cleaning room continues to exist in a state of poor repair with leaking machines.

190. Dr. Burdick was and remains deeply concerned about the welfare of his patients.

191. His understanding at the time was that the CDC, FDA, Joint Commission, HHS, and CMS all required hospitals to properly reprocess their scopes and track and eradicate any scope infections that did occur.

192. Dr. Burdick believed then – and continues to believe now – that it is fraud to submit bills to Government Healthcare Programs and private healthcare funding sources for reimbursement for procedures performed with dirty scopes. His belief is supported by my myriad Federal regulations.

193. One of the Medicare Conditions of Participation is the requirement that hospitals establish and maintain robust infection control systems.

194. Failing to clean scopes and track and control post-scope infections can result in CMS citations under this Condition of Participation.

195. And, more basically, the failure to properly clean scopes increases healthcare costs by causing entirely preventable and extremely expensive infections.

196.    In addition, the Hospital is required to report scope infections to the FDA's MAUDE database.

197.    Baylor has consistently failed and refused to do so.

198.    Before the Joint Commission, or other survey and inspection entities, visit the Hospital, Baylor distributes training and scripts in an effort to compel physicians and other staff to lie, obfuscate, dissemble about, and generally hide Baylor's non-compliant protocols, and the Hospital's history of serious patient harm.

6.    *BUMC's dirty and dangerous practices are not limited to the GI Lab*

199.    In addition to dirty scopes, BUMC's other surgical departments also use dirty tools.

200.    For example, orthopedic surgeries have taken place using equipment that was still wet and/or contaminated with prior patient bone fragments.

201.    Baylor also routinely fails to properly clean its reusable bronchoscopes resulting in otherwise avoidable post-procedure infections.

202.    Various infectious disease doctors have noticed a number of unexpected infections in the post-transplant population which can be tied back to improperly cleaned bronchoscopes.

203.    In addition, for a span of time in 2019, the sterilization process for the surgical instrument trays used in nearly all general surgery operating rooms at BUMC suffered a critical breakdown.

204.    As a result, during this time, many (if not most or all) surgeries at BUMC were conducted using tools that could not be confirmed as sterile.

205.    Patients were not notified.

206.    Instead, when a Baylor administrator sent an internal email to staff acknowledging the sterilization lapse, the email was quickly "retracted" and deleted from users' inboxes.

207.    Baylor's refusal to abide by the infection control conditions of payment and participation extend to even the simplest, and oldest, of patient protection measures: gloves.

208.    On many occasions, various Baylor staff fail to change their gloves between handling various dirty and clean items during procedures and when installing and handling surgical tool cleaning equipment. Cross contamination of sterile tools and equipment results.

209.    Olympus representatives have noticed and commented about Baylor staff's inappropriate and inadequate use of gloves.

210.    Similarly, Baylor staff have used the "dirty" scope transportation tray to transport clean scopes from "clean" scope room into a procedure room for use on a patient thereby contaminating the "clean" room, all scopes that came into contact with that tray, and the scopes and tools in the "clean" room. No remedial cleaning was performed.

211.    In addition to Relator and the infectious disease doctors, other Baylor doctors and even external vendors have noticed and commented on Baylor's repeated failure to properly clean and disinfect reusable medical equipment. Baylor leadership has rebuffed or retaliated against all such feedback.

7.    *Specific examples of patient harm*

212.    Real people have suffered serious and permanent harm as a result of Defendants' actions.

213.    For example, immediately after an ERCP procedure, Patient 1 became infected with the very antibiotic resistant E. coli organism common in post-ERCP scope infections. This young mother first lost her fingers and toes to the infection in February 2018 before finally dying in October 2018. She never left the hospital alive.

214.    Patient 2 was undergoing an endoscopic examination when the scope being used failed to work properly. The scope had not been properly leak tested during cleaning, permitting

liquids to penetrate the device and cause optic failure and potential contamination. The exam was terminated before completion, necessitating a repeat visit and extra procedure. The patient was never informed of the infection/contamination risk.

215. Patient 3 was undergoing an endoscopic procedure to ablate blood vessels when prior patient detritus was noted inside the scope and then inside the patient. The patient was not informed and not tested for communicable diseases.

216. Patient 4 underwent an ERCP and immediately re-presented with pain that was diagnosed as a liver abscess. She had contracted a drug-resistant post-scope organism and had to spend 26 days in the hospital as a result and receive IV antibiotics.

217. Patient 5 suffered a cholangitis infection after ERCP.

218. Patient 6 contracted enterococcus fecalis after an ERCP.

219. Patient 7 contracted an infection after endoscopy.

220. Patient 8 underwent an ERCP procedure and then contracted Pseudomonas and Klebsiella infections.

221. Patients 9, 10, 11, 12, 13, 14, 15, 16, 17, 19, 20, 21, 22, 23, and 24 each contracted infections immediately after an endoscopic procedure.

222. Of particular note on this list, patient 19 developed a brain abscess and died.

223. Patient 25 was diagnosed with an abscess after an endoscopic procedure and was later hospitalized in Austin, Texas.

224. Patient 26 was twice infected with E. coli after colonoscopies.

225. Patient 27 was treated with an endoscopic procedure and during the procedure one of the channels was observed to be occluded with prior patient detritus. Despite Dr. Burdick's protestations, the patient was not informed and was not offered testing.

226. Patients 28, and 29 were diagnosed with MRSA after an endoscopic procedure and Patient 29 also developed a liver abscess.

227. Patient 30 was diagnosed with vancomycin resistant E. coli after an endoscopic procedure.

228. Patient 31 was diagnosed with vancomycin resistant enterococcus faecium and Candida Glabrata after an ERCP.

229. All of these infections were preventable post-scope infections caused by Baylor's failure to properly clean and maintain their scopes and abject failure to meet the infection control Condition of Participation.

230. Even patients who did not die or lose appendages were severely harmed.

231. Not only are unnecessary hospital stays disruptive to a patient's outside work and life, but they are terribly expensive – to the government and to the individual patient.

232. Perhaps most troubling, however, every day spent in-patient is another opportunity to contract other in-hospital infections and complications.

233. For example, IV-administered antibiotics alone can cause a litany of potentially deadly adverse reactions and complications including erythema multiforme, Stevens Johnson Syndrome, Toxic Epidermal Necrolysis, kidney or liver injury, various allergic reactions, and Clostridium difficile diarrheal infection (in which a patient can quite literally defecate themselves to death). Perhaps ironically, IV antibiotic treatment can cause further antibiotic-resistant infection.

234. Some, if not most, of the patients who obtain an endoscopic procedure already have compromised health which makes the impact of these avoidable adverse events all the more dangerous and important to prevent.

- 35 -

235.    Since the original Complaint was filed, additional patients have been (and continue to be) infected with avoidable resistant post-scope infections as a result of Baylor's continued failure and refusal to properly meet the conditions of participation and payment for the various Government Healthcare Programs.

### C.    False Endoscopy Claims – Inadequate Equipment Maintenance

236.    Just like the Hospital refused and refuses to allocate sufficient resources to properly clean its endoscopy equipment, the Hospital also refuses to allocate sufficient resources to maintaining its equipment.

237.    Despite Dr. Burdick's repeated protests, the Hospital continues not to stock sufficient and necessary materials; permits staff to mistreat, damage, and destroy equipment; and refuses to timely replace damaged and unusable items.

238.    Again, patients have suffered sometimes life-threatening adverse events as a result.

1.    *Specific examples of patient harm*

239.    Often, BUMC physicians have no choice but to attempt life-saving procedures despite knowing the equipment presented for their use is not appropriate.  Indeed, refusing to perform a necessary procedure would consign the patient to death, while using broken or otherwise inappropriate tools still offers some chance of better outcome.

240.    For example, Room 9 contained faulty wiring for months.  Dr. Burdick raised concerns about the faulty wiring to Dr. Lembcke during a committee meeting and also with Dr. Lichliter and Ms. Buhman, who was taking notes.

241.    Still, the Hospital refused to conduct repairs.

242.    Eventually, Patient 32 underwent an endoscopic procedure in Room 9 and suffered an esophageal perforation because of the faulty wiring – the wiring the Hospital had known about but refused to fix for a span of months.

243.    In lay terms, an esophageal perforation means a wire or other piece of equipment was stabbed through the patient's throat – from the inside out.

244.    The patient survived but was required to stay in the Hospital for a prolonged time.

245.    Patients 32, 33, and 34 suffered similar esophageal perforations when their physician was forced to use a bent savary wire during endoscopic procedures.

246.    Patient 7 underwent an endoscopic procedure in February 2018 but the multi-stent deployment device necessary for her procedure was not available. She also contracted a post-scope infection.

### 2.    *Baylor staff repeatedly attempts to use dirty equipment.*

247.    On several occasions techs and nurses working with Dr. Burdick have attempted to use devices, equipment, and tools on patients despite those materials being accidentally dropped on the floor or put into the trash.

248.    Since the original Complaint was filed, this behavior has continued. BUMC staff has continued to try to use grounded and trash materials on patients.

249.    In addition, dirty laryngeal scopes (used to place a breathing tube) have been used on patients.

250.    Of course, Dr. Burdick prohibits the use of such obviously contaminated materials during his cases, but Hospital staff training and infection control is clearly wildly and dangerously deficient.

251.    Also, Dr. Burdick cannot know what happens under the supervision of all of the other physicians.

252.    Surely if every GI physician was providing consistent instruction that these sorts of contaminated materials are not to be used on patients, the staff would stop making such attempts.

253.    Because this is a repeat problem, on information and belief, at least one Hospital physician is permitting floor and trash tools to be used on patients.

> 3.    *Baylor uses defective and broken scopes.*

254.    The Hospital trades patient safety for saving money in other respects.

255.    For example, the Hospital will send broken scopes out to third-party repairs shops which charge less money than Olympus, the device manufacturer.

256.    Recently, more than one of these third-party-repaired scopes has been repeatedly causing post-scope infections.

257.    Finally, the Hospital permitted Olympus to examine these defective scopes.

258.    Olympus confirmed that the scopes were badly colonized by bacteria and unsafe to use on patients.

259.    Olympus also uncovered the cause: internal damage caused by the cheap third-party repair shop had created physical reservoirs for the bacteria and made cleaning the scopes next to impossible.

260.    Again, the Hospital put saving money over patient safety.


## III.    Defendants made fraudulent claims for procedures performed with inadequate supervision.

### A.    Medicare's Requirements for Medical Supervision

261.    The CMS Manual provides "operating instructions, policies, and procedures" for billing Medicare and Medicaid for services.

262.    Per the CMS Manual, gastroenterology fellows must be supervised when performing endoscopic procedures.

263.    In particular, the relevant regulations require that supervising or teaching physicians be physically present and in the room for the entire viewing or for the entire period of time a scope is inside a patient.

264.    CMS Transmittal 1780 indicates: "To bill Medicare for endoscopic procedures ... the teaching physician must be present during the entire viewing.  The entire viewing starts at the time of insertion of the endoscope and ends at the time of removal of the endoscope.  Viewing of the entire procedure through a monitor in another room does not meet the teaching physician presence requirement."

265.    The Baylor Medical Staff bylaws also require attending physicians to provide direct supervision of non-attending physicians.

**B.     False Endoscopy Claims – Inadequate Supervision**

266.    Despite the clear conditions for payment, the Baylor Defendants and GI Defendants permit or require fellows in the Baylor Gastroenterology Fellowship Program to perform all or parts of endoscopic procedures without supervision.

267.    Consistent with CMS requirements and Baylor's own bylaws, Dr. Burdick repeatedly requested compliance with proper policy with respect to supervision of the fellows in the Baylor Gastroenterology Fellowship Program.  Dr. Burdick complained that fellows often do not wait for attending physicians to be present in the room before undertaking various endoscopic procedures.

268.    Instead, the Program's routine pattern and practice is to permit, encourage, and/or require fellows to practice with inadequate supervision.

269.    Attending physicians, and the Hospital, are able to generate substantially more fees and reimbursements by booking multiple procedures under the same "supervising" attending

- 39 -

during the same timeslot and then permitting the fellows to perform the procedures without the attending in the room.

270.    On other occasions, fellows perform procedures and round on patients when their assigned attending physician is out of town, but the attendings nevertheless sign the charts as if they were in town and supervising the fellows or personally treating the patients.

271.    Submitting claims to Government Healthcare Programs for supervision or patient services that were not performed is a violation of the FCA and CMS rules and regulations requiring supervising endoscopists to be "present during the entire viewing".

272.    Not only do these practices violate relevant and applicable regulations, but they expose patients to an unnecessary risk of harm.

273.    In fact, at least one patient died when a fellow attempted an endoscopic procedure without the required supervision.

274.    Dr. Burdick repeatedly raised this lack of supervision issue with his superiors and Hospital leadership.

275.    In addition, some of the fellows complained about the lack of appropriate supervision.

276.    Dr. Burdick reported these issues to Dr. Boland, Dr. Schiller, and Dr. Stuart Spechler. (Dr. Spechler is the current Chief of the GI Section.)

277.    Dr. Burdick also raised this lack of supervision issue during at least one GI Section meeting, but Dr. Schiller simply "tabled" the issue.

278.    No meaningful action has been taken by the Hospital to address this issue.

279.    Defendants, and their leadership teams, continued to bill the United States and the State of Texas for services they knew were not being provided.

280. As with the other issues raised by Dr. Burdick, HealthTexas and Hospital leadership repeatedly chose to ignore Dr. Burdick, best practices, and negative patient outcomes in favor of a broken but less expensive status quo.

281. Eventually, Dr. Burdick refused to work with the Baylor Gastroenterology Fellowship Program because the program refused to enforce the supervision requirements.

282. Further, Dr. Burdick properly refused to bill for or sign charts attesting to personal supervision of the fellows, when in fact he was not providing that personal supervision.

283. Since the original complaint was filed, the lack of supervision has continued. As recently as the fall of 2019, Drs. Hamilton and Kale could be observed using staff computers while their fellows struggled to complete endoscopic procedures in their absence.

284. Nevertheless, Drs. Hamilton and Kale signed their respective patients' charts with the false attestation: "I was present and participated during the entire procedure, including on-key portions charts."

285. It is fraud to bill Government Healthcare Programs for procedures completed with the wrong, or nonexistent, supervision and it is fraud to bill Government Healthcare Programs for procedures, or portions of procedures, that were not actually performed by the billing physician.

## IV.  Defendants made fraudulent claims for medically worthless procedures.

286. Various Baylor doctors are known to perform screening procedures, such as routine colonoscopies, so far outside the applicable guidelines as to render the procedures worthless.

287. For example, one key guideline for colonoscopies is the withdrawal time. In other words, there is a maximum speed at which a doctor can competently and usefully perform a

colonoscopy: it takes at least six minutes. Moving faster results in missing preventable and treatable lesions and diagnoses.

288. As a result of improperly completed colonoscopies, multiple Baylor patients have been diagnosed with preventable cancers or cancers that could have been treated much earlier in the disease process had the routine screening been properly conducted in accordance with the applicable standards.

289. Dr. Burdick brought these colonoscopy concerns directly to Dr. Boland and at a GI Oncology conference, but no action was taken to address the problem and it continues to this day.

290. It is fraud to bill Government Healthcare Programs for procedures performed so obviously poorly as to be rendered worthless.

## V.     The Baylor Defendants and HealthTexas retaliated against Relator.

291. Federal and state law prohibit retaliation against whistleblowers like Dr. Burdick.

292. 31 U.S.C. § 3730(h) protects whistleblowers from retaliation and specifically prohibits discharging, demoting, suspending, threatening, harassing, "or in any other manner discriminat[ing] against [Relator] in the terms and conditions of employment because of lawful acts done by the [Relator] in furtherance of an action under this section or other efforts to stop 1 or more violations of" the False Claims Act.

293. Relief under the FCA anti-retaliation section includes "2 times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorneys' fees." 31 U.S.C. § 3730(h)(2).

294.    The TFCA prohibits substantially the same retaliatory conduct and provides the same measures of relief at V.T.C.A. Hum. Res. Code § 36.115.

295.    In addition, Texas Health and Safety Code §§ 161.134 and 161.135 prohibit retaliation against both employees and non-employees.

296.    Instead of meaningfully addressing any of the above patient care and safety issues, Baylor and HealthTexas instead unlawfully retaliated against Dr. Burdick.

297.    Baylor and HealthTexas's retaliation took four main forms:

    a.  unreasonable and unsafe working conditions;

    b.  financial retaliation;

    c.  sham suspensions; and

    d.  scuttling a competing job offer.

298.    The plan they executed largely accomplished these goals, causing Dr. Burdick serious harm.

299.    Dr. Burdick is and was a highly productive and lucrative source of fees for the Hospital, and until July 31, 2017, for HealthTexas.

300.    Both Baylor's and HealthTexas's interests were served by capturing Dr. Burdick's productivity for themselves – while simultaneously and aggressively discouraging Dr. Burdick from "causing trouble" by raising patient safety concerns or concerns about fraud.

301.    Retaliating against Dr. Burdick was easier and more cost effective than spending the time and money required to hire and train sufficient staff to properly clean and maintain equipment, to properly staff the GI Lab, or cease committing fraud.

302.    Significantly, many of the individual doctors involved in making decisions about how Baylor should respond to Dr. Burdick's concerns were members of DHAT and TDDC and in direct commercial competition with Dr. Burdick.

303. Their individual and group pecuniary interests were served by punishing and limiting Dr. Burdick. By doing so, DHAT and TDDC doctors could capture and control the easiest, lowest risk, and most lucrative patients and procedures.

304. During at least one DHAT meeting, a discussion occurred about how to get rid of the competition from HealthTexas – meaning competition by Dr. Burdick.

305. The Hospital is a willing participant and co-conspirator in the fraud and misconduct conducted by the DHAT and TDDC GI physicians who work at Baylor institutions.

306. Baylor and HealthTexas advanced this conspiracy by retaliating against Dr. Burdick instead of addressing his real and serious concerns, reports of misconduct, and obvious patient harm.

307. Baylor benefits from the lucrative hospital-side fees generated by DHAT and TDDC physician misconduct.

308. In addition, Baylor is not willing or able to hold DHAT or TDDC to account for, or stop, their misconduct. That is because Baylor is not able to adequately staff the GI departments at its various Dallas area hospitals without relying on DHAT and/or TDDC.

309. In fact, in or about 2014 and/or 2015, the GI Lab Director position was open and Dr. Burdick applied and was interviewed.

310. Dr. Burdick had served in this role at his prior institution before joining HealthTexas and Baylor, and was arguably the best qualified of the internal candidates.

311. Dr. Schiller told Dr. Burdick that it would be better to hire an outsider than hire Dr. Burdick.

312. Dr. Michael Emmett is Chief Medical Officer for BUMC and a member of the Quality Assurance Committee – the peer review body serving the Medical Executive Committee.

- 44 -

313.     Dr. Emmett had a meeting with Dr. Burdick to discuss Dr. Burdick's application for the Director job and said, "You can't go against DHAT." Dr. Schiller is a member of DHAT and was eventually given the GI Lab Director position.

### A.     Unreasonable and Unsafe Working Conditions

#### 1.     *Abnormally long work hours and lack of call coverage.*

314.     Dr. Burdick was routinely made to work longer hours and perform higher risk and more difficult procedures and techniques than his peers.

315.     Meanwhile, DHAT and TDDC doctors regularly refused patients, procedures, and on-call assignments in order to focus on low-risk, easy-to-perform, and high-paying procedures.

316.     Instead of balancing or rotating after-hours patient care responsibilities among the various GI doctors working in the Hospital, Baylor and HealthTexas manufactured and maintained an unworkable and unsafe call system.

317.     Dr. Burdick was required to be on call every day of the year, and was called most nights and often multiple times per night.

318.     On occasion, being called afterhours required only a brief phone call from Dr. Burdick to on-duty Hospital staff. But frequently, a late-night phone call required Dr. Burdick to drive back to the Hospital and perform at least one procedure.

319.     In this way, Dr. Burdick was expected to work 11-12 hour days, also work overnight, and then work another 11-12 hour day.

320.     The schedule was unreasonable by any measure.

321.     The Physician Employment Agreement between HealthTexas and Dr. Burdick states that HealthTexas would assist Dr. Burdick in obtaining call coverage.

322.     HealthTexas failed and refused to do so.

- 45 -

323.   Baylor and HealthTexas routinely placed Dr. Burdick in the impossible position of maintaining reasonable, safe working hours or permitting patients to die.

324.   On at least one occasion – on a day when he simply could not find room in his schedule to accommodate another patient – Dr. Burdick explicitly declined a patient transfer from a neighboring state.

325.   Later, in the middle of the night, Dr. Burdick was awoken by a phone call from the Hospital telling him that the very patient he had declined to admit, had nevertheless been admitted and transferred to Dr. Burdick against Dr. Burdick's express direction.

326.   That patient was now at Baylor, bleeding to death, and would certainly die unless Dr. Burdick immediately returned to the hospital and performed a procedure.

327.   Dr. Burdick returned to the hospital, coordinated the emergency staffing and set-up on his way in, performed the procedure, and saved the patient's life.

328.   This patient event occupied Dr. Burdick from approximately 1:00 a.m. until 8:00 a.m., after which he was expected to work his "normal" 11-12 hour day, and then be on call again the following night.

2.   *A retaliatory 10-minute phone policy.*

329.   To make matters worse, Baylor instituted a policy which required Dr. Burdick to respond to any call or page – including clearly non-emergent middle of the night inquiries – within 10 minutes.

330.   Given HealthTexas and the Hospital's inadequate staffing, it was often impossible for Dr. Burdick to respond within this 10-minute window – because he was caring for patients elsewhere in the hospital.

- 46 -

331. But because Baylor and HealthTexas were intent on targeting Dr. Burdick for retaliation, they chose to ignore these obvious conflicts and mitigating circumstances. As a result, Dr. Burdick would be "written up" for failing to timely respond to pages and after-hours calls.

332. In fact, as part of his retaliation, Dr. Lembcke (the then Chief Medical Officer for BUMC) imposed a truly nonsensical and extreme version of this policy specifically and uniquely on Dr. Burdick.

333. Dr. Lembcke required that Dr. Burdick respond to any page or call within no more than 10 minutes without regard for anything else that might be happening at the same time.

334. For example, Dr. Lembcke instructed Dr. Burdick to stop any procedure or other patient interaction he might be having to immediately respond to any page or call without exception.

335. When Dr. Burdick asked if this new policy of stopping all other activities to respond to pages included stopping lifesaving procedures or interrupting surgical or semi-surgical events to respond to non-urgent phone calls and pages, Dr. Lembcke responded emphatically in the affirmative: "**If they die, they die.**" Apparently, responding to pages was more important to Dr. Lembcke than patient care. Whether or not Dr. Lembcke will admit to speaking literally, he created and then enforced a special, unique, irrational, and impossible-to-attain standard for Dr. Burdick – and only for Dr. Burdick.

336. It is possible that Dr. Lembcke's horribly misplaced priorities are due to an outsized focus on patient satisfaction survey results – a priority Dr. Lembcke communicated numerous times. In any event, this example was not the only time Dr. Lembcke has expressed a preference for convenience over patient care.

337.    In or about September 2015, Dr. Lembcke told Dr. Burdick it was preferable that some patients die – preventable deaths – instead of tying up resources treating them when those resources could be used to perform routine, pre-scheduled, and non-emergent procedures instead.

338.    Separately, another physician leader, Dr. Valek, made similar comments to Dr. Burdick.

339.    Similarly, in or about September 2015, Dr. Lembcke instructed Dr. Burdick to stop responding to "codes"[4] even when he was the closest physician responder, or possessed special skills and training that might make a difference in the survivability of a severely distressed or dying patient.  Again, Dr. Lembcke's misplaced focus on the pace of and satisfaction scores generated by pre-scheduled out-patient care led to patient harm.

340.    Accordingly, "write ups" occurred even when HealthTexas and Hospital leadership knew, or should have known, that Dr. Burdick was treating other patients or was working in an area of the Hospital with poor cell or pager service.

341.    Yet they chose to engage in a systematic game of "gotcha" with Dr. Burdick, unfairly and improperly accusing him of "timeliness," "responsiveness," and "professionalism" issues.

342.    In each case, Baylor unreasonably applied "demerits" and "writeups" without regard for the realities of the situation and without providing Dr. Burdick any opportunity to contest or correct the false allegations.

---

[4] A "code" is called over the hospital public announcement system when a patient "crashes" or suffers a cardiac arrest or other precipitous event like loss of an airway.  Normally, the closest providers rush to the coding patient's bedside and immediately attempt to resuscitate the patient. Every second counts.  Irreversible anoxic brain injury can occur within as little as a minute. Even otherwise healthy patients can suffer permanent damage in three to five minutes.

343. Indeed, Hospital leadership were so keen to target and punish Dr. Burdick, they even demerited him when, during one particularly bad storm, Dr. Burdick's home and neighborhood lost power and phone service.

344. While Dr. Burdick was able to make his way through the storm to the Hospital, he was not able to return a phone call within Dr. Lembcke's 10-minute window. Dr. Lembcke imposed his impossible rule even when phone calls did not go through.

345. In another instance, when the Hospital's call system *failed to work properly and never delivered a call or* page to Dr. Burdick, Dr. Lembcke nevertheless harangued and demerited Dr. Burdick for failing to respond.

           3.    *Other providers were treated materially differently.*

346. Baylor did not treat DHAT or TDDC physicians as harshly.

347. On many occasions DHAT and TDDC physicians would ignore, avoid, or simply reject their afterhours duties, and Dr. Burdick would eventually be called to do their work, further adding to his already over-full schedule and compounding the unreasonable call schedule and demands.

348. For example, over Christmas 2015, DHAT physicians simply refused to attend to any obligations at the Hospital. Other medical providers with sick patients were then forced to call Dr. Burdick who had to do DHAT's work for them.

349. In 2017, Dr. Hamilton transferred a patient to Baylor without first ensuring there was a doctor at Baylor willing and able to see the patient. Dr. Burdick cared for the patient in Dr. Hamilton's absence. At least one fellow complained to Dr. Schiller about Dr. Hamilton's actions, but no corrective action was taken.

350. DHAT and TDDC physicians who ignored, avoided, or rejected their call duties were not subject to any or adequate investigation or remediation.

- 49 -

351. Three particular incidents bear special mention.

352. First, in or about late April 2015, Dr. Burdick received an afterhours call about a patient who was bleeding to death.

353. This was one of Dr. Schiller's patients and not on Dr. Burdick's service.

354. But Dr. Schiller – who was then the Director of the GI Lab and had agreed to take over as Chief of the GI Section for the retiring Dr. Boland, and was Dr. Burdick's in-hospital superior and economic competitor – had failed to answer or respond to four separate and urgent calls requesting that Dr. Schiller attend to his rapidly dying patient.

355. Hospital staff then called Dr. Burdick who responded to the first call he received, performed a procedure, and saved the patient's life.

356. Dr. Burdick reported Dr. Schiller's failure to respond to the Medical Executive Committee and to Dr. Lembcke, the Chief of Medicine, and Dr. Schiller's in-hospital superior.

357. Dr. Lembcke and the Medical Executive Committee refused to take any action or even investigate the matter.

358. Second, more recently, when Dr. Burdick was unavailable because he was taking his very sick father to a chemotherapy appointment, Dr. Greg Hodges refused to see a patient who needed an urgent consult.

359. Instead of responding to the consult as he should have, Dr. Hodges instructed Dr. Burdick to see the patient.

360. At the time, Dr. Hodges was a physician leader of TDDC.

361. Third, in or about February 2014, a DHAT physician was called to care for a patient afterhours. That doctor, apparently but mistakenly believing that Dr. Burdick initiated the call, stopped by the GI Lab to threaten and attempt to physically intimidate Dr. Burdick.

362. Dr. Burdick immediately reported this incident to Drs. Emmett and Boland. But again, no corrective action or investigation occurred.

363. HealthTexas and Hospital senior staff permitted Dr. Schiller, Dr. Hodges, and other providers to shirk their duties and otherwise misbehave because they knew they could take advantage of Dr. Burdick's willingness to always put patient care first. And it was part of the Defendants' conspiracy to punish Dr. Burdick with unreasonable work conditions while simultaneously limiting and restricting his economic success.

364. Leadership also routinely rejected Dr. Burdick's request that it establish a safer and more sensible call system.

365. For example, these call system reform requests were made to Drs. Schiller and Boland. But at least Dr. Schiller was in direct competition with Dr. Burdick.

366. Dr. Burdick's concerns were also elevated to Drs. Emmett and Lembcke, as well as to HealthTexas Chief Administrative Officer Sarah Gahm, and Chief Clinical Officer and Chairman of the Board of HealthTexas Dr. F. David Winter.

367. No corrective action was taken until late 2014, when Baylor established a call system limited to emergency bleeding and foreign bodies cases.

368. Large gaps in patient care and physician overuse remained. Dr. Burdick continued to raise these issues at GI Section meetings but was told the problem was not big enough to be worth solving.

369. In 2014, after one of their doctors sent a fellow to respond to afterhours call instead of responding himself and the patient died, DHAT and TDDC entered into a joint call agreement but left HealthTexas, and Dr. Burdick, out.

370. HealthTexas and the Hospital continued to regularly assign Dr. Burdick more difficult, higher risk, and less remuneratively lucrative cases. Such assignments were in part

because his skills as a physician are properly beyond reproach, but also as a way to punish him for daring to raise the issues mentioned above. It was also a way to preserve the easier and more lucrative assignments for his competitors.

371. In addition, Dr. Lembcke began to insist that, on a daily basis, Dr. Burdick visit each and every patient for whom he performed a procedure or had been consulted.

372. Many of these patients do not benefit from being seen by Dr. Burdick on a daily basis. Often Dr. Burdick plays either a small role or no role at all in the patient's continuing care.

373. Nevertheless, Dr. Lembcke requires Dr. Burdick to disturb the patients, unnecessarily increase the expense of their care, and add many hours every day to his already overfull schedule.

374. This unusual and unique requirement was not imposed on DHAT or TDDC physicians or on other sub-specialties and has no grounding in competent patient care.

**B.    Financial Retaliation**

375. While employed by HealthTexas, Dr. Burdick's income entirely depended on the collection of fees for services – if he was not able to perform procedures, he could not earn any compensation.

376. Each procedure, treatment, or service Dr. Burdick provides for a patient generates separate physician and hospital charges and bills.

377. HealthTexas was responsible for billing patients, and remitting a portion of what was paid by the patient back to Dr. Burdick.

378. A significant percentage of what the patient paid for the physician-side bills was retained by HealthTexas which shares common ownership with the Hospital. (Conversely, the

hospital-side portion of the charges – typically ten-times larger than the physician portion of the bill – was kept entirely by the Hospital.)

379.   In 2015, HealthTexas hired another GI doctor but Baylor refused to provide this new physician and Dr. Burdick sufficient time in the GI Lab to perform procedures.

380.   The direct and intended result was to artificially suppress Dr. Burdick's income.

381.   Dr. Schiller was the GI Lab director at the time, a member of DHAT, and in direct financial competition with Dr. Burdick.

382.   HealthTexas and Baylor improperly depressed Dr. Burdick's income further by charging him for various inflated and unnecessary "expenses".

383.   For example, in or about September 2015, HealthTexas moved Dr. Burdick's offices to the Colorectal Surgical Center and began to charge Dr. Burdick dramatically higher "expenses" for the new space.

384.   Similarly situated DHAT and TDDC physicians were provided meaningfully different, and better, offices for substantially the same or lower expenses.

385.   These increased "expense" charges improperly reduced Dr. Burdick's compensation.

386.   In addition, because HealthTexas was doing such a poor job billing and collecting from patients, Dr. Burdick repeatedly requested permission to hire his own medical billing personnel.

387.   In this way, he could gain responsibility for – and control over – his physician-side billings.

388.   These requests, however, were rejected out of hand.

- 53 -

389.    In contrast, other GI physician groups, and other groups within HealthTexas, were permitted to perform their own in-house medical billing – exactly what Dr. Burdick was requesting.

390.    Similarly, Dr. Burdick, but not his DHAT competitors, was required to use Baylor provided anesthesia coverage.

391.    Dr. Burdick was treated differently and unfairly – in apparent retaliation for his appeals for cleaner scopes, appropriate supervision of fellows, and fair and safe scheduling.

392.    In July of 2017, Dr. Burdick finally managed to extricate himself from HealthTexas.

393.    Since leaving HealthTexas and gaining control over his billing and expenses, Dr. Burdick has been able to more than double his income – without any meaningful change in the number of procedures performed.

394.    However, Baylor found a new way to financially punish Dr. Burdick.

395.    For more than a year, the Baylor-controlled insurance program refused to accept Dr. Burdick as an in-network provider and rejected all of his bills.

396.    When he was at HealthTexas, Baylor insurance accepted Dr. Burdick's bills.

397.    Baylor insurance is the only insurance that refused to accept Dr. Burdick's bills.

398.    Nevertheless, because Baylor requires Dr. Burdick to respond to all calls and pages and because Baylor permits DHAT and TDDC physicians to shirk and avoid their patient care responsibilities, Dr. Burdick is often compelled to treat Baylor-insured patients on an emergent basis.

399.    Even then, Baylor refused to provide Dr. Burdick compensation for these patient services.

400. Similarly, and also with Baylor's acquiescence, DHAT physicians routinely refuse to see or treat non-insured patients.

401. Inevitably, other Hospital staff will call Dr. Burdick to treat the patients DHAT rejects for economic reasons.

402. If Dr. Burdick does not agree to treat these patients, even when his schedule is otherwise already overfull, Dr. Burdick is harassed and demerited for being "uncooperative."

### C. Sham Suspensions

403. The retaliation effected by Baylor and HealthTexas became substantially more serious in or about August 2015 when the Hospital unilaterally and improperly suspended Dr. Burdick's privileges for a period of 14 days.

404. In or about May 2016, Baylor and HealthTexas again suspended Dr. Burdick for 14 days.

405. One or both of these suspensions were orchestrated and imposed by one or more of the following: the Governing Board of the Hospital, the Medical Staff Executive Committee, the Medical Staff Office, the Quality Assurance Committee, or a similar committee or subcommittee.

406. Dr. Burdick cannot provide more precise allegations about the source of these sham suspensions because Defendants rejected and obstructed every effort Dr. Burdick made to discover the rules, bylaws, policies, and procedures which govern each of the above-named entities and committees.

407. Dr. Joseph Martin Rothstein led the Quality Assurance Committee at the time and Drs. Terry D. Noah and Timothy R. Valek signed the letters providing formal notice of the suspensions to Dr. Burdick.

1.    *First Sham Suspension*

408.    In or about August 2015, Dr. Burdick received a letter from the Hospital telling him that he was being suspended for 14 days.  The vaguely-worded reason for his suspension had something to do with the timeliness of his work.

409.    This first retaliatory and sham suspension was imposed shortly after Dr. Burdick complained about the dirty scopes, scope infections, and Dr. Schiller's failure to appropriately respond to the afterhours call described above.

410.    Prior to the imposition of the first sham suspension, Dr. Burdick had also been asking TDDC and DHAT to coordinate with him on afterhours call.

411.    Dr. Burdick asked HealthTexas and Hospital leadership for details behind this suspension.

412.    They refused to tell him.

413.    Dr. Burdick asked for an opportunity to respond to or correct any factual allegations against him.

414.    He was denied that too.

415.    Dr. Burdick requested the relevant bylaws, rules, and policies which might govern his employment, work at the Hospital, and discipline.

416.    He was again denied.

417.    In short, Dr. Burdick was denied the most basic due process rights to which any employee is entitled.

418.    Dr. Burdick was not afforded due process and the August 2015 suspension was both procedurally and substantively fatally flawed.

419.    This unsupported suspension – issued unilaterally and without due process supposedly under the guise of the Hospital's bylaws – damaged Dr. Burdick's reputation and improperly interfered with his ability to earn a living.

420.    In fact, the suspension, and the process by which Baylor arrived at and implemented the suspension, were in violation of the relevant bylaws, rules, and policies.

2.    *Second Sham Suspension*

421.    In or around May 2016, Baylor and HealthTexas again suspended Dr. Burdick for 14 days, this time under the false pretext that Dr. Burdick improperly treated a patient.

422.    Shockingly, just prior to the imposition of this second sham suspension, Baylor leadership rejected Dr. Burdick's requests that the Hospital follow appropriate infection control protocols.

423.    In February 2016, a Baylor patient died from a post-scope acquired MRSA infection.

424.    Then, Dr. Lembcke refused Dr. Burdick's request and suggestion that patients exposed to known dirty scopes be notified.

425.    The pretextual and false allegations which formed the basis for the second sham suspension were related to the April 2016 treatment of a patient in severe distress.

426.    The patient was suffering from cholecystitis, biliary colic, cholangitis, and cirrhosis and, without intervention, was certain to die over the coming days or weeks.

427.    Surgery and medicine teams had run out of options.

428.    Dr. Burdick was aware of two procedures that could have been attempted to treat this patient, but one had resulted in a similarly situated patient's death only weeks earlier.

429.     It was agreed – by the doctors treating the patient and the patient himself – that the patient's only and best chance at survival was for Dr. Burdick to perform the other of the two interventional endoscopic procedures to gain access to, and then drain, the patient's gallbladder.

430.     The procedure, techniques, and risks were discussed with the patient's team of providers, the patient, and his family, and the procedure is well supported by the literature.

431.     There was universal agreement that this was the appropriate – indeed, only viable – course of action. Dr. Burdick was well qualified to do it, and the patient gave his informed consent.

432.     Unfortunately, after the procedure, the patient did not improve and was eventually taken for additional surgery.

433.     After surgery failed, the patient died.

434.     Importantly, the additional scans taken before surgery as well as the surgical team's observations during surgery all confirmed that Dr. Burdick had properly and competently performed his endoscopic procedure as did later outside expert review.

435.     It was later discovered that the stent used during the endoscopic procedure was defective.

436.     The stent in question is the only device appropriate and approved for this procedure.

437.     There was no alternative device that could have been used.

438.     Following this surgery, Dr. Burdick retrieved all similar stents that were used on patients.

439.     Although the stent is approved and marketed as a fully covered stent, Dr. Burdick discovered that the coating around the stents had holes.

- 58 -

440.    He also reviewed the images from the deceased gallbladder patient's procedure and found holes in that particular stent as well.

441.    Dr. Burdick consulted with the nation's leading experts about the procedure, and together they concluded that the holes revealed a defect in the stent, and that those holes allowed bile to escape into the patient's body causing infection and death.

442.    Dr. Burdick reported the problem with the holes in the stent – along with the adverse patient outcome – to the manufacturer and FDA.

443.    Dr. Burdick was the first person to report these defects to FDA.

444.    The defect was unknown and undiscoverable before this particular patient's procedure.

445.    Due to Dr. Burdick's discovery and responsible reporting, FDA convened meetings, studied the issue, and eventually followed up with the manufacturer to address the defects Dr. Burdick found.

446.    Immediately after receiving notice that this case would be reviewed, Dr. Burdick requested an opportunity to present to the relevant Hospital committee substantial evidence about the procedure in question, the appropriateness of the procedure in this instance, and his competent performance of the procedure.

447.    But again, the Hospital refused to allow Dr. Burdick his basic due process rights.

448.    He requested and was denied the opportunity to present witnesses and evidence, receive allegations against him, obtain an outside review, and be represented at any meeting.

449.    Despite Dr. Burdick's requests, the other doctors involved in the patient care at issue were prohibited from attending or being otherwise involved in the meeting.

450.    Contrary to state, federal, and hospital guidelines, no physician with the training and experience to perform the procedure under review participated in the meeting or in the

decision to sanction and suspend Dr. Burdick. Nor was Dr. Burdick provided with adequate notice or the appropriate opportunity to be heard.

451.    Instead, doctors in direct financial competition with Dr. Burdick imposed an unjustified suspension.

452.    In addition, Dr. Lembke openly mocked Dr. Burdick during the peer review committee meeting.

453.    Upon information and belief, Dr. Emmett misstated facts while this suspension was being considered during at least one Executive Committee meeting.

454.    Dr. Burdick has since amassed additional substantial documentation and expert opinions about the appropriateness of the procedure; about the technique he used to treat this patient; about his performance of this particular procedure and technique; and about defects in the stent that led to this patient's bad outcome.

455.    Multiple times after the 2016 meeting, Dr. Burdick asked senior Hospital leadership for the opportunity to present additional evidence, supporting witnesses, and expert testimony – for consideration or reconsideration of his suspension.

456.    And multiple times various senior Baylor personnel formally and informally promised Dr. Burdick that he would have that review.

457.    In fact, as recently as December 2017, a Baylor Vice President and Assistant General Counsel claimed the Hospital was in the process of setting up just such a hearing. But no such hearing ever occurred.

458.    In fact, several of these same "leaders", Drs. Emmett and Lembcke, told Dr. Burdick that the suspension – and any negative remarks – would be removed from Dr. Burdick's file.

- 60 -

459. Yet, as an official matter, these same people repeatedly delayed, dithered, or rejected Dr. Burdick's repeated requests for a hearing, reconsideration, or even the submission of relevant exculpatory information.

460. Dr. Burdick was not afforded due process and the May 2016 suspension was both procedurally and substantively fatally flawed.

461. Both of the suspensions had the additional effect of financially punishing Dr. Burdick insofar as he lost a total of 28 working days.

462. As to both of the faulty suspensions, Dr. Burdick was repeatedly assured that any comments or marks in his file would be kept strictly confidential and internal, and not shared with any external or outside parties.

463. These assurances were false.

**D.    Scuttled job opportunity**

464. In or around March 2017, Dr. Burdick received a job offer from Methodist Dallas Medical Center, a Baylor competitor.

465. The Methodist offer included a substantially more lucrative compensation package than what Dr. Burdick was receiving from Baylor and HealthTexas.

466. After the offer was extended, Baylor and/or HealthTexas issued a letter or other communication to Methodist which defamed and disparaged Dr. Burdick and his professional competence and formed a part of their retaliation against him.

467. Stuart Frederick Owen, M.D. signed this letter.

468. As a result, Methodist rescinded its job offer.

469. Despite repeated requests, Dr. Owen, Methodist, and Baylor have all refused to share with Dr. Burdick a copy of the letter.

470.    Upon information and belief, the letter contains false factual statements indicating that Dr. Burdick is not well qualified as a Gastroenterologist and Endoscopist and/or is a danger to patients and the public.

471.    None of these statements are true.

472.    To the extent Baylor and/or HealthTexas claim the letter contains only a recitation of the fact that Dr. Burdick was twice suspended, the statements have a defamatory meaning insofar as they create the impression that Dr. Burdick is not well suited to employment by a healthcare entity such as Methodist and/or is a danger to patients and the public and form a part of Baylor and/or HealthTexas's retaliation against him.

473.    In addition, the suspensions are themselves of such illegitimate and unlawful character that any publication which purports to report on their existence without, at a minimum, providing the context of their unlawful character, creates a false and defamatory impression in the mind of the recipient and form a part of Baylor and/or HealthTexas's retaliation against him.

474.    Upon information and belief, the letter recites that Dr. Burdick was placed on a performance improvement or other similar monitoring or quality improvement plan. That statement is also false and further creates the impression that Dr. Burdick is not well suited as a physician, caregiver, or employee.

475.    In addition to the letter sent to Methodist, Defendants have also created or permitted the creation of notes and comments in Dr. Burdick's Medical Staff file which are false, defamatory, and retaliatory.

476.    For example, Dr. Burdick's Medical Staff file includes statements that he is "disruptive", mistreated at least one patient, failed to timely respond to patient or staff inquires or needs, and requires some form of monitoring, education, remediation, or training.

477.    Each of those statements is false, defamatory, and retaliatory.

478.    To the extent Dr. Burdick's Medical Staff file includes materials related to the sham suspensions, those factual statements are similarly false, defamatory, and retaliatory at least insofar as the sham suspensions were themselves illegitimate and unlawful and create a negative, false, and defamatory impression of Dr. Burdick's professional competency.

479.    As a result of Defendants' conduct, Dr. Burdick has suffered substantial monetary and non-monetary damages.

480.    For example, Dr. Burdick suffered substantial and incalculable damage to his reputation and professional standing.

481.    He also suffered monetary damages equal to the loss of the Methodist job offer and the resultant artificially extended period of employment with HealthTexas.

482.    In addition to the lost salary that resulted from the scuttling of his Methodist job offer, Dr. Burdick suffered two additional categories of money damages related to the Methodist job:

    a.  he was unable to participate in the private equity buyout of GI practices that occurred at Methodist after his intended start date; and

    b.  he was unable to participate in the recouping of ancillary services and facility profits that are paid to GI physicians practicing at Methodist.

483.    As mentioned above, Dr. Burdick also suffered damages equal to:

    a.  the loss of income associated with the 28 working days he was improperly barred from the hospital; and

    b.  the loss of income related to the procedures he performed and care he delivered for non-paying patients and patients covered by Baylor-affiliated health insurance.

484.    All of this retaliatory conduct has been part of an ongoing and continuing violation of state and federal law, and Dr. Burdick's various rights thereunder, that has continued to the present day.

485. Dr. Burdick, the Baylor Defendants, and HealthTexas are parties to a tolling agreement made effective August 10, 2018, and by way of several extensions, continuing to and through January 31, 2020.

486. Under the tolling agreement, the Baylor Defendants and HealthTexas agreed to toll all statutes of limitation and other time-based defenses related to "any action or proceeding brought by Dr. Burdick against" the Baylor Defendants and/or HealthTexas.

## VI.   The Hospital had a pattern and practice of putting retaliation and competition ahead of patient care.

487. Dr. Burdick is not the only physician to have been mistreated and retaliated against for raising concerns about these issues.

488. For example, one of the GI Lab technicians reported the existence of dirty scopes to the nurse manager. He also pointed out how and why the scopes were not being properly processed. But, instead of addressing this legitimate patient safety issue, Baylor retaliated by firing the technician's wife who had been working as a technician at the Hospital.

489. As intended, the technician also subsequently left Baylor.

490. Similarly, Dr. Jacqueline O'Leary was a hepatologist at Baylor and complained about dirty scopes and fraudulent billing practices.

491. Separately, another physician mistakenly severed a liver artery during surgery ultimately leading to the patient's death. The physician then attempted to conceal and cover-up his grave error.

492. Dr. O'Leary and Dr. Burdick internally reported this physician and his conduct but the doctor in question was permitted to continue treating, and harming, patients at Baylor.

493. Again, and again, Baylor and HealthTexas refused to take action to protect patients. Instead, HealthTexas refused to renew Dr. O'Leary's contract.

494. Shockingly, HealthTexas used Dr. O'Leary's divorce as the pretext for this retaliation.

495. At the time, Dr. O'Leary's spouse worked as a surgeon at Baylor.

496. Yet another physician, an intensivist, and at least three other ICU physicians, complained about patient safety policies and then quit after being told no changes would be made and no action, other than retaliation against the messengers, would be taken.

497. The intensivist and the other ICU doctors also complained about medical billing fraud.

498. For example, they had witnessed other physicians billing for more than 24 hours in a day, claiming to have done work they did not do, and charging for a higher level of care or complexity than what was actually provided.

499. Instead of addressing the concerns raised about patient deaths and billing fraud, Baylor leadership told this intensivist he was "just not a Baylor guy."

500. DHAT physicians take their economic competition with Dr. Burdick very seriously.

501. For example, when DHAT physicians ask Dr. Burdick to assist or consult on a particular procedure or patient's care, they try to prevent Dr. Burdick from writing a note on the patient's chart.

502. Whether they do this out of perceived competitive edge or misplaced professional pride is not important.

503. They attempt to enforce their demands by threatening to further "get" Dr. Burdick through additional sham peer review processes.

504. As noted above, Dr. Burdick is not the only victim of DHAT, Baylor and HealthTexas retaliation.

505.    In or about 2013, DHAT reported a resident physician for a sham HIPAA violation after the resident properly sought Dr. Burdick's assistance to save a dying patient's life.

506.    DHAT and Baylor then continued to target this junior doctor until eventually withdrawing his privileges, all because he had the temerity to put a patient's life over DHAT's petty one-sided feud with Dr. Burdick.

507.    Notably, the novel endosponge repair Dr. Burdick performed to save this patient's life was only required because the same treating physician Dr. O'Leary and Dr. Burdick had reported for severing a liver artery had severed the patient's esophagus while performing a hiatal hernia procedure which itself was not indicated.

508.    Instead of addressing this repeat bad behavior or otherwise meaningfully and properly addressing Drs. O'Leary and Burdick's reports, Baylor elevated the physician into a leadership position.

509.    DHAT and Dr. Schiller were also upset that the U.S. Military has chosen to partner with Dr. Burdick and not with DHAT physicians. In retaliation and abuse of his leadership position, Dr. Schiller has attempted to interfere with the U.S. Military fellowship program by imposing extraneous and unnecessary requirements on the fellows.

510.    TDDC physicians have also been protected from the consequences of their bad acts.

511.    For example, one TDDC doctor who has since died of dementia was permitted by TDDC and Baylor to make questionable or inappropriate treatment and referral decisions for years despite Dr. Burdick's reports to Dr. Boland and the Oncology conference.

512.    As a result, at least one patient underwent an unnecessary colon resection and several other patients were required to have additional and otherwise unnecessary procedures as a result of this physician's bad conduct.

513.    Other TDDC and DHAT physicians have failed to diagnose cancers, made inaccurate diagnoses, and caused injuries to patients and been protected by TDDC, DHAT, and Baylor.

        1.    *Baylor puts patients at risk.*

514.    Baylor too put patient outcomes behind organization expedience.

515.    On at least one occasion, Dr. Lembcke told Dr. Burdick that he and Baylor would prefer that Dr. Burdick not intervene and attempt potentially life-saving procedures on otherwise very sick and dying patients because it was better for the patient to simply die of the patient's existing disease process than take the "risk" of performing life-saving procedures that had less than a 100% chance of success.

        2.    *Hospital leadership protects itself instead of patients.*

516.    Not only do Dr. Lembcke and Baylor protect and insulate DHAT physicians, but Dr. Lembcke himself is also afforded special treatment.

517.    At one point, Dr. Lembcke directed that a clearly impaired patient be discharged wearing nothing but a bedsheet. At the time, the patient was being cared for by members of the Hospitalist service and Dr. Lembcke was the Director of the Hospitalist service. In other words, Dr. Lembcke was the direct supervisor of the physicians responsible for the patient.

518.    Shortly after discharge, the patient committed suicide via gunshot to the head.

519.    Various physicians involved in this patient's care and inappropriate discharge were disciplined – all except Dr. Lembcke. Yet he was the physician leader who actually directed that the patient be discharged in the first place.

520.    Along the same lines, Baylor has instituted a purposely vague and imprecise privileges granting system so that the Hospital and its leadership have more flexibility to control and impose punishments and restrictions on physicians after the fact.

521.    Finally, other Baylor physician leaders pursue similar anti-patient and unlawful policies and practices with the apparent goal of burnishing their and the Hospital's metrics.

522.    For example, the Chief Medical Officer ("CMO") at another Baylor location repeatedly directed that a physician's C. Difficile testing order be rescinded.

523.    C. Difficile (commonly known as C. Diff) is a potentially very deadly and highly contagious bacterial infection of the colon. Lax infection control and antibiotic misuse and overuse can all lead to C. Diff infections.

524.    All known hospital acquired C. Diff infections must be reported to the CDC and the National Healthcare Safety Network.

525.    In order to evade these reporting requirements, the CMO (who was not seeing or treating the patient) repeatedly overrode the treating physician's testing orders.

526.    When questioned by the treating doctor, the CMO said he would permit empiric treatment of the patient but would not allow the treating doctor to confirm the C. Diff. infection because doing so would trigger the reporting requirement.

527.    Upon information and belief, certain executive employees of the Baylor Defendants and/or HealthTexas, including the CMO, receive bonus compensation for keeping reported infections below a certain threshold.

## CAUSES OF ACTION

### COUNT I – VIOLATION OF 31 U.S.C. § 3729(a)(1)(A)
### (All Defendants)

528.    Relator repeats and re-alleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

529.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(A), imposes liability upon those who knowingly present or cause to be presented false claims for payment or approval.

- 68 -

530. Defendants knowingly and willfully violated the False Claims Act by presenting, or causing to be presented, false claims for payment or approval.

531. Specifically, for at least the six years before the filing of the original complaint in this action, and continuing thereafter, Defendants submitted medical bills to Government Healthcare Programs including Medicare and Medicaid seeking payment for services that were not reasonably medically necessary, were rendered incompetently, rendered incompletely, not rendered at all, or provided while Defendants were in violation of a Condition of Participation.

532. All Defendants knew or should have known (as defined in 31 U.S.C. § 3801(a)(5)) that they had for years made, presented, or submitted, or caused to be made, false or fraudulent claims for payment to Government Healthcare Programs.

533. Each of the claims submitted or caused to be submitted by the Defendants is a separate false and fraudulent claim.

534. The Defendants presented or caused to be presented these claims knowing their falsity, or in deliberate ignorance or reckless disregard that such claims were false.

535. The United States was unaware of the foregoing circumstances and conduct of the Defendants and, in reliance on said false and fraudulent claims, authorized payments to be made to the Defendants, made such payments, and has been damaged.

536. Because of these false or fraudulent claims submitted or caused to be submitted by Defendants, the United States has been damaged in an amount to be determined at trial.

## COUNT II – VIOLATION OF 31 U.S.C. § 3729(a)(1)(B)
### (All Defendants)

537.    Relator repeats and re-alleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

538.    The False Claims Act, 31 U.S.C. § 3729(a)(1)(B), imposes liability upon those who knowingly make, use, or cause to be made or used, false records or statements material to a false or fraudulent claim.

539.    Defendants knowingly and willfully violated the False Claims Act by making, using, or causing to be made or used, false records or statements material to false or fraudulent claims.

540.    Specifically, for purposes of obtaining or aiding to obtain payment or approval of reimbursement claims made to Government Healthcare Programs, for at least the six years before the filing of the original complaint in this action, and continuing thereafter, the Defendants made or presented, or caused to be made or presented, to the United States false or fraudulent records, knowing these records to be false or fraudulent, or acting with reckless disregard or deliberate ignorance thereof.

541.    Each medical record, bill, and invoice submitted to the government in support of Defendants' above-described false claims is a separate false record or statement and separate violation of 31 U.S.C. § 3729(a)(1)(B).

542.    The United States was unaware of the foregoing circumstances and conduct of the Defendants and, in reliance on said false and fraudulent records, authorized payments to be made to the Defendants, made such payments, and has been damaged.

543. Because of these false or fraudulent statements submitted or caused to be submitted by Defendants, the United States paid the claims, resulting in damages to the United States in an amount to be determined at trial.

## COUNT III – VIOLATION OF 31 U.S.C. § 3729(a)(1)(C)
### (All Defendants)

544. Relator repeats and re-alleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

545. The False Claims Act, 31 U.S.C. § 3729(a)(1)(C), imposes liability upon those who conspire to commit a violation of another sub-section of the False Claims Act.

546. Defendants knowingly, in reckless disregard, and/or in deliberate ignorance of the truth conspired between themselves, with their employees and administrators, and others, to violate the False Claims Act.

547. Defendants conspired to submit false and fraudulent claims related to the provision of substandard and inappropriate care.

548. Defendants did in fact submit false and fraudulent claims for substandard and inappropriate care.

549. As a consequence of their conspiracies, the United States paid these claims when it would not have but for Defendants' unlawful conduct.

550. As a result of this conspiracy, and the resulting false or fraudulent claims submitted or caused to be submitted by Defendants, the United States paid the claims, resulting in damages to the United States in an amount to be determined at trial.

### COUNT IV – VIOLATION OF 31 U.S.C. § 3730(h)
### (Baylor Defendants and HealthTexas)

551.    Relator repeats and re-alleges the allegations set forth in the preceding

paragraphs, as if fully set forth herein.

552.    31 U.S.C. § 3730(h) states in pertinent part:

**(h)Relief From Retaliatory Actions.—**

**(1)In general.—**

Any employee, contractor, or agent shall be entitled to all
relief necessary to make that employee, contractor, or
agent whole, if that employee, contractor, or agent is
discharged, demoted, suspended, threatened, harassed, or
in any other manner discriminated against in the terms
and conditions of employment because of lawful acts done
by the employee, contractor, agent or associated others in
furtherance of an action under this section or other efforts
to stop 1 or more violations of this subchapter.

**(2)Relief.—**

Relief under paragraph (1) shall include reinstatement
with the same seniority status that employee, contractor,
or agent would have had but for the discrimination, 2
times the amount of back pay, interest on the back pay,
and compensation for any special damages sustained as a
result of the discrimination, including litigation costs and
reasonable attorneys' fees. An action under this
subsection may be brought in the appropriate district
court of the United States for the relief provided in this
subsection.

553.    As more particularly set forth in the foregoing paragraphs by virtue of the acts

alleged herein, Relator was engaged in protected activity by repeatedly advising his superiors that

he believed that Defendants had violated the law by, among other things, submitting false claims

for reimbursement to Government Healthcare Programs.

554.    From time to time during his employment with HealthTexas and at BUMC,

Relator reported in good faith what he believed to be serious violations of 31 U.S.C. § 3729.

- 72 -

555.   Relator informed Defendants on multiple occasions, both orally and in writing, that he believed Defendants were engaging in fraudulent conduct.

556.   As a direct result of Relator having lawfully investigated and reported to his superiors what he believed to be fraudulent conduct or wrongdoing, Defendants threatened, harassed, and/or discriminated against Relator in the terms and conditions of his employment in violation of 31 U.S.C. § 3730(h).

557.   For example, the Baylor Defendants and HealthTexas orchestrated, tolerated, or reinforced sham peer reviews, sham suspensions, and rejection of Dr. Burdick's attempts to reverse the false and inappropriate negative remarks in his Medical Staff file.

558.   HealthTexas and the Baylor Defendants also threatened and harassed, or tolerated others threatening and harassing, Dr. Burdick at work.

559.   HealthTexas and the Baylor Defendants imposed special, negative, and onerous work conditions on Dr. Burdick while simultaneously reducing his compensation and ability to perform his job.

560.   Finally, HealthTexas and the Baylor Defendants managed to scuttle a job offer he obtained from a competitor.

561.   As a further direct result of these unlawful retaliatory employment practices and in violation of 31 U.S.C. §3730(h), Relator sustained permanent and irreparable harm, resulting in the loss of an employment offer from a competing hospital and substantial guaranteed remuneration, the loss of 28 working days, reduced opportunities to treat patients and earn income, rejection of Baylor affiliated insurance claims and generally a loss of earnings, benefits, future earning power, front and back pay and interest due thereon.

## COUNT V – TEXAS FALSE CLAIMS ACT
### (All Defendants)

562.    Relator repeats and re-alleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

563.    This is a *qui tam* action brought by Plaintiff-Relator on behalf of the State of Texas to recover actual damages plus civil penalties including double the actual damages and not less than $11,181 and not more than $22,363 for each Defendant's violation of V.T.C.A. Hum. Res. Code § 36.001 *et seq.*

564.    As set out in more detail above, Defendants violated V.T.C.A. Hum.  Res. Code § 36.002 by causing numerous false claims to be made, used, and presented to the State of Texas by their deliberate and systemic violation of federal and state laws and regulations, including the FCA, the Social Security Act, and various other laws and regulations related to Government Healthcare Programs by, *inter alia*, knowingly:

   a.   making or causing to be made false statements or misrepresentations in order to obtain Medicaid program payment(s) which were not properly authorized;

   b.   concealing or failing to disclose information in order to obtain Medicaid program payment(s) which were not properly authorized;

   c.   making or causing to be made false statements or misrepresentations about the condition of the Hospital or other information required by the State or Federal laws, regulations, or Government Healthcare Programs;

   d.   presenting or causing to be presented claims for payment for services rendered by persons not properly credentialed to provide the billed services;

   e.   making or causing to be made claims for payment for services that were inadequate or inappropriate;

   f.   making, using, or causing to be used false records or statements in furtherance of their attempts to obtain payment from the Texas Medicaid program; and

   g.   conspiring to perform some or all of the above unlawful acts.

565. The State of Texas, by and through the Texas Medicaid program and other state healthcare programs, was unaware of Defendants' conduct and paid the claims submitted by healthcare providers and third-party payers in connection therewith.

566. Compliance with applicable Medicare, Medicaid, and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims submitted to the State of Texas in connection with Defendants' conduct. Compliance with applicable Texas statutes was also an express condition of payment of claims submitted to the State of Texas.

567. Had the State of Texas known that Defendants were violating the federal and state laws and regulations cited herein and/or that the claims submitted in connection with Defendants' conduct failed to meet the reimbursement criteria of the Government Healthcare Programs or were premised on false and/or misleading information, it would not have paid the claims submitted by or on behalf of Defendants.

568. As a result of Defendants' violations of V.T.C.A. Hum. Res. Code § 36.002, the State of Texas has been damaged in an amount to be proven at trial.

569. Plaintiff-Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of himself and the State of Texas.

## COUNT VI – RETALIATION UNDER TEXAS FALSE CLAIMS ACT
### (Baylor Defendants and HealthTexas)

570. Relator repeats and re-alleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

571. Texas Hum. Res. Code Section 36.115 provides in pertinent part:

> A person, including an employee, contractor, or agent, who
> is discharged, demoted, suspended, threatened, harassed, or

in any other manner discriminated against in the terms and conditions of employment because of a lawful act taken by the person or associated others in furtherance of an action under this subchapter, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this subchapter, or other efforts taken by the person to stop one or more violations of Section 36.002 is entitled to:

(1) reinstatement with the same seniority status the person would have had but for the discrimination; and

(2) not less than two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the discrimination, including litigation costs and reasonable attorney's fees.

572.   As more particularly set forth in the foregoing paragraphs by virtue of the acts alleged herein, Relator was engaged in protected activity by repeatedly advising his superiors that he believed that Defendants had violated the law by, among other things, submitting false claims for reimbursement to Government Healthcare Programs.

573.   From time to time during his employment with HealthTexas and at BUMC, Relator reported in good faith what he believed to be serious violations of Tex. Hum. Res. Code Section 36.002.

574.   Relator informed Defendants on multiple occasions, both orally and in writing, that he believed Defendants were engaging in fraudulent conduct.

575.   As a direct result of Relator having lawfully investigated and reported to his superiors what he believed to be fraudulent conduct or wrongdoing, Defendants threatened, harassed, and/or discriminated against Relator in the terms and conditions of his employment in violation of Tex. Hum. Res. Code Section 36.115.

576.   For example, the Baylor Defendants and HealthTexas orchestrated, tolerated, or reinforced sham peer reviews, sham suspensions, and rejection of Dr. Burdick's attempts to reverse the false and inappropriate negative remarks in his Medical Staff file.

577. HealthTexas and the Baylor Defendants also threatened and harassed, or tolerated others threatening and harassing, Dr. Burdick at work.

578. HealthTexas and the Baylor Defendants imposed special, negative, and onerous work conditions on Dr. Burdick while simultaneously reducing his compensation and ability to perform his job.

579. Finally, HealthTexas and the Baylor Defendants managed to scuttle a job offer he obtained from a competitor.

580. As a further direct result of these unlawful retaliatory employment practices and in violation of Tex. Hum. Res. Code Section 36.115, Relator sustained permanent and irreparable harm, resulting in the loss of an employment offer from a competing hospital and substantial guaranteed remuneration, the loss of 28 working days, reduced opportunities to treat patients and earn income, rejection of Baylor affiliated insurance claims and generally a loss of earnings, benefits, future earning power, front and back pay and interest due thereon.

## COUNT VII – RETALIATION UNDER
## TEXAS HEALTH AND SAFETY CODE § 161.135
### (Baylor Defendants)

581. Relator repeats and re-alleges the allegations set forth in the preceding paragraphs, as if fully set forth herein.

582. Texas Health and Safety Code § 161.135 provides in pertinent part:

> (a) A hospital, mental health facility, or treatment facility may not retaliate against a person who is not an employee for reporting a violation of law, including a violation of this chapter, a rule adopted under this chapter, or a rule of another agency.

> (b) A hospital, mental health facility, or treatment facility that violates Subsection (a) is liable to the person retaliated against. A person who has been retaliated against in violation of Subsection (a) may sue for injunctive relief, damages, or both.

(c) A person suing under this section has the burden of proof, except that it is a rebuttable presumption that the plaintiff was retaliated against if:

(1) before the 60th day after the date on which the plaintiff made a report in good faith, the hospital, mental health facility, or treatment facility:

…

(B) transfers, disciplines, suspends, terminates, or otherwise discriminates against the person …; or

(D) transfers, discharges, punishes, or restricts the privileges of the person …

583.    As more particularly set forth in the foregoing paragraphs by virtue of the acts alleged herein, Relator was engaged in protected activity by repeatedly advising his superiors that he believed that Defendants had violated the law by, among other things, submitting false claims for reimbursement to Government Healthcare Programs.

584.    From time to time during his employment with HealthTexas and at BUMC, Relator reported in good faith what he believed to be serious violations of Tex. Hum. Res. Code Section 36.002, 31 U.S.C. § 3729, and the rules of other governmental agencies including the state and federal agencies responsible for administering the Government Healthcare Programs.

585.    Relator informed Defendants on multiple occasions, both orally and in writing, that he believed Defendants were engaging in fraudulent conduct.

586.    As a direct result of Relator having lawfully investigated and reported to his superiors what he believed to be fraudulent conduct or wrongdoing, Defendants threatened, harassed, and/or discriminated against Relator in the terms and conditions of his employment in violation of Tex. Health and Safety Code Section 161.135.

587.     For example, the Baylor Defendants and HealthTexas orchestrated, tolerated, or reinforced sham peer reviews, sham suspensions, and rejection of Dr. Burdick's attempts to reverse the false and inappropriate negative remarks in his Medical Staff file.

588.     HealthTexas and the Baylor Defendants also threatened and harassed, or tolerated others threatening and harassing, Dr. Burdick at work.

589.     HealthTexas and the Baylor Defendants imposed special, negative, and onerous work conditions on Dr. Burdick while simultaneously reducing his compensation and ability to perform his job.

590.     Finally, HealthTexas and the Baylor Defendants managed to scuttle a job offer he obtained from a competitor.

591.     As a further direct result of these unlawful retaliatory employment practices and in violation of Tex. Health and Safety Code Section 161.135, Relator sustained permanent and irreparable harm, resulting in the loss of an employment offer from a competing hospital and substantial guaranteed remuneration, the loss of 28 working days, reduced opportunities to treat patients and earn income, rejection of Baylor affiliated insurance claims and generally a loss of earnings, benefits, future earning power, front and back pay and interest due thereon, and mental anguish.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff-Relator demands and prays that judgment be entered against Defendants, jointly and severally, as to the federal claims as follows:

A.     ordering that Defendants cease and desist from violating the False Claims Act, 31 U.S.C. § 3729 *et seq.*;

B.     directing that each Defendant pay an amount equal to three times the amount of damages the United States has sustained because of such Defendant's actions;

C.     directing that each Defendant, pursuant to the False Claims Act, 31 U.S.C.

§§ 3729 *et seq.*, pay penalties of not less than $11,181 and not more than $22,363 for each such Defendant's violation of the False Claims Act;

D.  granting Relator the maximum amount allowed under 31 U.S.C. § 3729, and/or any other applicable provision of law;

E.  directing that each Defendant, jointly and severally, pay Plaintiff-Relator's fees and costs, including attorneys' fees, as provided by the False Claims Act;

F.  ordering that the Baylor Defendants and HealthTexas pay two times back pay, plus interest and compensate Relator for other compensatory, additional, and special damages sustained as a result of the retaliation, including litigation costs and reasonable attorneys' fees;

G.  directing that each Defendant pay interest on all sums ordered paid;

H.  ordering that Relator recover such other relief as the Court deems just and proper; and

I.  granting such other and further relief as the Court deems just and proper.

**WHEREFORE**, Plaintiff-Relator demands and prays that judgment be entered against

Defendants, jointly and severally, as to the claims under Texas law as follows:

A.  ordering that Defendants cease and desist from violating the TFCA;

B.  directing that Defendants pay an amount equal to the actual damages suffered by the State of Texas plus pre-judgment interest;

C.  directing that Defendants pay a penalty of two times the amount of actual damages and not less than $11,181 and not more than $22,363 for each such Defendant's violation of the TFCA;

D.  directing that each Defendant, jointly and severally, pay Plaintiff-Relator's fees and costs, including attorneys' fees, as provided by the TFCA;

E.  granting Relator the maximum amount allowed under V.T.C.A. Hum. Res. Code § 36.110, and/or any other applicable provision of law;

F.  ordering that the Baylor Defendants and HealthTexas pay two times back pay, plus interest and compensate Relator for other compensatory, additional, and special damages including his mental anguish sustained as a result of the retaliation, together with exemplary damages and litigation costs and reasonable attorneys' fees;

G.  directing that each Defendant pay interest on all sums ordered paid;

H.    ordering that Relator recover such other relief as the Court deems just and proper; and

I.    granting such other and further relief as the Court deems just and proper.

## **REQUEST FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby requests a trial by jury.

Dated:   January 31, 2020

By:    _____
       Joseph H. Gillespie (Local Counsel)
       State Bar No. 24036636
       Email: joe@gillespiesanford.com

       **GILLESPIE SANFORD, L.L.P.**
       4925 Greenville Ave., Suite 200
       Dallas, Texas 75206
       Tel:    (214) 800-5111
       Fax:    (214) 838-0001

       POLLOCK COHEN LLP
       Darth M. Newman (Lead Counsel,
       *Pro Hac Vice* Application Forthcoming)
       DNewman@PollockCohen.com
       60 Broad Street, 24th Floor
       New York, NY  10004
       (212) 337-5361


       *Counsel for Plaintiff Relator*

- 81 -